EXXON CORPORATION, Cities Service Company, Conoco, Inc., Marathon Petroleum Company, Sun Oil Company of Pennsylvania, the Standard Oil Company (Ohio), Tosco Corporation, Plaintiffs,

v.

DEPARTMENT OF ENERGY, Donald P. Hodel, Secretary of Department of Energy, Rayburn Hanzlik, Administrator, Economic Regulatory Administration, Department of Energy, George B. Breznay, Director Office of Hearings and Appeals, Department of Energy, Defendants,

The 341 Tract Unit of the Citronelle Field, Intervenor-Defendant.

TEXACO, INC., Atlantic Richfield Co., Chevron U.S.A., Inc., Plaintiffs,

v.

DEPARTMENT OF ENERGY, Donald P. Hodel, Secretary of Department of Energy, Rayburn Hanzlik, Administrator, Economic Regulatory Administration, Department of Energy, Richard T. Tedrow, Acting Director of Hearings and Appeals, Department of Energy, Defendants,

The 341 Tract Unit of the Citronelle Field, Intervenor-Defendant.

Civ. A. Nos. 81–25 MMS, 81–99 MMS.

United States District Court,
D. Delaware.

Jan. 31, 1985.

See also 577 F.Supp. 703.

Thomas Herlihy, III, Herlihy, Herlihy & Harker, Wilmington, Del. (Donald B. Craven, Jay L. Carlson, and Craig D. Miller, Miller & Chevalier, Washington, D.C., of counsel), for plaintiffs in Civ. A. No. 81–25 MMS.

William T. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Dudley A. Zinke, Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel), for plaintiffs in Civ. A. No. 81–99.

Joseph J. Farnan, Jr., U.S. Atty., and Sue L. Robinson, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., Thomas H. Kemp, and Kathrine L. Henry, U.S. Dept. of Energy, Washington, D.C., for defendants.

Arthur G. Connolly, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Del. (Williams S. D'Amico, J. Peter Luedtke, Carl A. Cira, Jr., and Marilyn Perry Jacobsen, D'Amico, Luedtke, Demarest & Golden, Washington, D.C., of counsel), for intervenor-defendant.

OPINION

MURRAY M. SCHWARTZ, District Judge.

These actions were brought by several major oil companies to set aside a decision by the Department of Energy ("DOE") awarding $63.8 million in exception relief to the 341 Tract Unit of the Citronelle Field ("Citronelle" or "the Unit"), an oil producer. The award of relief was designed to alleviate the inequity of Citronelle's being denied the benefits of a DOE regulatory program and to induce Citronelle to initiate a major crude oil recovery project, using tertiary enhanced recovery techniques. A substantial amount of this $63.8 million came from the plaintiffs through their participation in another DOE regulatory program. Plaintiffs attack the DOE decision awarding relief as being outside the agency's authority and not supported by substantial evidence. Both sides have moved for summary judgment, since the only relevant facts are found in the administrative record, which exceeds 13,000 pages. These motions require the Court to consider the interaction of the several federal statutes that regulated oil producers. For the reasons set forth below, plaintiffs' motion will be granted in part, and this matter will be returned to the agency for further proceedings.

I. **Regulatory Background—Price Controls**

A. **Entitlements Program**

To understand the energy regulatory programs that are relevant to this proceeding, a review of the history of oil price and allocation controls is necessary. The price of crude oil was regulated by DOE and its predecessors from August 19, 1973, until January 28, 1981. *See generally* 10 C.F.R. Parts 210–12 (1980) (repealed 1981). The price regulation system separated crude oil into three distinct categories—"old" oil, "new" oil, and "exempt" oil. In general, if

the volume of oil drawn from a producing property was less than or equal to the volume produced in the base year of 1972, the oil was considered "old" oil and subject to the "lower tier" maximum price. If the property produced more than it did in 1972, the excess was deemed "new" oil and could be sold at the higher but still controlled "upper tier" price. Foreign oil and certain types of domestic oil, such as newly discovered oil or oil produced by stripper wells, were exempt from price controls and could be sold at market prices.[1] *See* 10 C.F.R. § 212, Subpart D (1980); *Union Oil Co. of California v. DOE,* 688 F.2d 797, 800 (Temp.Emer.Ct.App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983).

This pricing system created inequities and economic distortions because some refiners, and some areas of the country, had greater access to inexpensive old oil than other refiners, who had to rely on more expensive types of oil. To remedy this problem, the Old Oil Entitlements Program was created. *See generally Cities Service Co. v. FEA,* 529 F.2d 1016 (Temp.Emer.Ct. App.1975) (describing Entitlements Program in detail), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976). The purpose of the Entitlements Program was to spread equally the benefit of access to price-controlled crude oil while retaining price controls and production incentives. Under this program, each refiner had an "entitlement" each month to a certain number of barrels of old oil, the number being based on the refiner's proportionate share of old oil. In general, if a refiner bought more old oil than it had entitlements for, the refiner would have to buy entitlements from a refiner who had not received as much old oil as it was entitled to in that month. To facilitate this transfer of money, DOE published lists of entitlements obligations each month, and refiners would buy or sell entitlements according to the list.

## B. Marginal Property Rule

Although the Entitlements Program helped to spread the benefit of access to price-controlled oil, it did little to encourage production from existing wells. In 1976, Congress attempted to correct this problem by passing the Energy Conservation and Production Act, Pub.L. No. 94–385, 90 Stat. 1125 ("ECPA"), which gave DOE additional pricing flexibility to provide incentives to increase the production of domestic crude oil. *See* 44 Fed.Reg. 22,010, 22,010 (April 12, 1979). DOE used this authority to promulgate the so-called "marginal property rule" on April 12, 1979. This rule authorized producers, as of June, 1979, to sell, at upper tier prices, crude oil taken from "marginal properties," which were properties producing a low volume of oil from deep wells at high cost. *Id.* at 22,013–4. In July, 1980, the marginal property rule was amended, effective June, 1979, to allow larger volumes of oil taken from deeper wells to be sold at upper-tier prices. 45 Fed.Reg. 47,406 (July 14, 1980).

## C. Tertiary Incentive Program

In addition to authorizing the marginal property rule, the ECPA also directed DOE to amend its regulations to "provide additional price incentives for bona fide tertiary enhanced recovery techniques." 15 U.S.C. § 757(j)(1)(A). "Tertiary enhanced recovery techniques are higher cost production methods which maximize oil production from a depleting field," and "typically include the injection of carbon dioxide, steam, or other substances in order to increase pressures in the oil reservoir and thereby promote additional production." *Union Oil Co. of California v. DOE,* 688 F.2d at 800 & n. 3. DOE responded to this directive in 1978 by amending its price regulations to exempt from price controls the increased production of domestic crude oil resulting from a qualified enhanced recovery project. 43 Fed.Reg. 33,678 (Aug. 1, 1978). Starting September 1, 1978, a new

---

**1.** The price differential was significant. For example, in December, 1980, the average price per barrel of the three categories of crude oil was: lower tier, $7.49; upper tier, $15.51; exempt, $34.55. 46 Fed.Reg. 14,157, 14,158 (Feb. 26, 1981).

category of crude oil, "tertiary incremental crude oil," was exempt from price controls and could be sold at market prices. *Union Oil*, 688 F.2d at 800. This program—the "tertiary incremental program"—gave producers some incentive to undertake tertiary projects because it gave them greater revenues once oil had been recovered by the use of tertiary techniques.

DOE soon realized, however, that this production incentive was inadequate to induce many producers to start tertiary projects, because tertiary projects typically involved "substantial pre-production expenses and a high risk of failure." 44 Fed.Reg. 18,677, 18,677 (March 29, 1979). DOE therefore designed the Tertiary Incentive Program "to provide 'front-end' money to producers engaged in the initiation or expansion of tertiary enhanced crude oil recovery projects." *Id.* Each "property"[2] could receive up to $20 million in front-end money, although a tertiary recovery project could receive more than $20 million in benefits if the project encompassed more than one property.

The mechanism used to provide front-end money for producers undertaking tertiary projects was described by the Temporary Emergency Court of Appeals in *Union Oil Co. of California v. DOE, supra:*

> Effective January 1, 1980, the Tertiary Incentive Program permitted a producer to recoup up to 75% of the "allowed expenses" it had "incurred" and "paid" in connection with a "qualified tertiary enhanced recovery project." 10 C.F.R. § 212.78(c). Producers were permitted to self-certify their projects as "qualified" and their expenses as "incurred" and "paid," subject to possible DOE audit. 10 C.F.R. § 212.78(d). Allowed expenses which had been incurred, paid, and reported could be recouped by selling otherwise price-controlled crude oil at uncontrolled market prices. 44 Fed.Reg. 51148, 51149 (Aug. 30, 1979). No limitations were imposed on prepaying tertiary expenses, so a producer could currently

> recoup prepaid expenses even though the tertiary enhanced recovery project might not be begun for a period of months or even years. 45 Fed.Reg. 40106, 40107 (Aug. 15, 1980).

688 F.2d at 800–01.

To make these "front-end" revenues readily available, DOE allowed producers to sell any of their price-controlled crude oil—including oil not produced by the property where the tertiary project was located—at uncontrolled prices. "For example, a producer with a qualified tertiary project in Alabama could recertify crude oil which it produced in Texas and would otherwise have sold at price-controlled levels. In other words, the right to sell tertiary incentive crude oil at market prices accrued to a particular producer, rather than to the production from a specific property." *Three Forty One (341) Tract Unit of the Citronelle Field*, 10 DOE ¶ 81,027, at 82,638 (1983) (hereinafter "Final Decision"). In addition, there were two alternative means by which producers that did not produce enough price-controlled crude oil could acquire front-end money: a producer could purchase an interest in the price-controlled crude oil of another producer and recertify it at market price, *see* DOE Interpretations 1980–22 and 1980–23, 45 Fed.Reg. 61,563–65 (Sept. 16, 1980); or the producer could sell a temporary interest in its tertiary project to a producer that had access to price-controlled crude. DOE Interpretation 1981–3, 46 Fed.Reg. 27,281 (May 18, 1981).

### D. Exceptions Relief

When Congress granted DOE the authority to promulgate this body of regulations, it also gave DOE the authority to make exceptions to any of its regulations. Section 504 of the DOE Act provides:

> The Secretary ... shall provide for the making of such adjustments to any rule, regulation or order ... issued under [various federal energy acts], consistent with the other purposes of the relevant

---

**2.** DOE had a particular definition of the term "property." *See* 10 C.F.R. § 212.72 (1980); *Proposed Decision*, R. 1506 & n. 2. In very general

and simplified terms, each separate and distinct producing reservoir could be considered a separate property. *Id.*

Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens ....

42 U.S.C. § 7194(a).[3] This section gave DOE broad powers to correct problems caused by its vast regulatory scheme and equalize the benefits and burdens of its regulations. Although this power involves a large measure of discretion, *see Bonnaffons v. DOE*, 646 F.2d 548, 552 (Temp. Emer.Ct.App.1981), DOE is required to award appropriate exception relief if an applicant shows that it meets the statutory criteria of "special hardship, inequity, or unfair distribution of burdens." *Final Decision*, 10 DOE at 82,647; *Husky Oil Co. v. DOE*, 582 F.2d 644, 652–53 (Temp.Emer.Ct. App.1978).

### E.  Decontrol

The statutory basis for the President's discretionary authority to maintain this scheme of price and allocation controls was scheduled to expire on September 30, 1981, under the terms of the EPAA. *See* 15 U.S.C. § 760g.  On January 28, 1981, President Reagan ordered price controls on crude oil and refined petroleum products lifted and ordered DOE to "promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order."  Executive Order No. 12,287, 46 Fed.Reg. 9909 (Jan. 30, 1981).  DOE subsequently ruled that producers could only recover tertiary incentive expenses incurred, paid, and reported prior to March 31, 1981.  46 Fed.Reg. 12,945, 12,947 (Feb. 19, 1981).  With the end of price controls, the tertiary incentive program was essentially abolished as of April 1, 1981.  *See* 46 Fed.Reg. 20,508, 20,509 (April 3, 1981); *Union Oil Co. of California v. DOE*, 688 F.2d at 803.

## II.  Factual Background

### A.  The Citronelle Unit

The Citronelle Field was discovered in 1955 at a depth in excess of 10,000 feet and was estimated to contain 319 million barrels of oil.  OHA Administrative Record ("R.") 6.  Through the use of primary and secondary recovery techniques, the Field produced approximately 5,000,000 barrels of oil annually from 1957 until 1972, when production began steadily declining.  R. 18. By the end of 1978, the year before Citronelle's exception application was filed, the Field had produced approximately 110 million barrels of crude oil, but annual production had fallen to 2,400,000 barrels.  R. 6, 18.  This oil was drawn from depths of 10,700 to 11,500 feet using waterflood recovery techniques, and, as a result, operating costs for the Field were relatively high. R. 19.

The ownership of the Field is unusual. The 341 Tract Unit of the Citronelle Field is made up of 341 contiguous forty-acre tracts located in Mobile County, Alabama. R. 11.  The Unit is a legal entity created by working interest owners through a "Unitization Agreement" to provide for the management and operation of the 341 tracts. R. 10–11.  There are currently over 850 working interest owners [4] and 1,500 royalty interest owners.[5]  *Final Decision*, 10 DOE at 82,637.  The working interest owners have also entered into a Unit Operating Agreement, which contains detailed guidelines for the operation of the Unit.  R. 10.

The Unitization Agreement combines the individual rights of the owners in order to carry out unitized operations, but it does not transfer title to the tract or its mineral interests.  R. 77.  Under the Agreement, the oil produced by the entire Unit is allocated to each owner according to a tract participation formula, which assigns to

---

**3.**  The Secretary of DOE has delegated this authority to make exceptions to the Director of the Office of Hearings and Appeals.

**4.**  A working interest owner owns the operating interest and has "the exclusive right to exploit the minerals on the land."  8 Williams & Meyers *Oil and Gas Law* 838–39 (1982).

**5.**  Royalty owners receive a share of the proceeds from the Unit's production but, unlike the working interest owners, have no voice in the operation of the Unit.  *Id.* at 656–67.

each owner a Tract Percentage of Participation. R. 79–82. Each owner is entitled to sell his percentage share of the crude oil produced. R. 80. Similarly, Unit expenses are apportioned to the working interest owners according to their Percentage of Participation. R. 223. In general, royalty interest owners are not responsible for operating expenses, R. 93, although certain royalty owners must pay a pro rata share of tertiary recovery costs. R. 343–44.

The actual operations of the Unit are conducted pursuant to the Unit Operating Agreement. R. 204. The Operating Agreement vests control of Unit operations in an Operators' Committee, and makes each working interest owner an "operator" with a seat on the Committee. R. 206. The Operators' Committee, pursuant to the Operating Agreement, employs a Unit Manager to conduct the ongoing operations of the Unit. R. 212. The Unit Manager is governed by the terms of the Unitization and Operating Agreements and by the supervision of the Operators' Committee. R. 83.

All significant decisions as to the operation of the Unit, including authorization of expenditures and new projects, must be made by vote of the Operators' Committee. R. 96. The vote of each operator has a weight equal to his Percentage of Participation in the Unit. R. 207. The affirmative vote of seventy-five percent of the voting interest is required in order to approve any decision. *Id.* Such decisions may be made during a meeting of the Operators' Committee or, if an insufficient percentage of voting interests is represented at a meeting, by poll vote. R. 208.

**B. Citronelle's Application for Exception Relief**

On August 8, 1979, the Citronelle Unit Manager, on behalf of the working interest owners, applied to DOE for exception relief pursuant to 42 U.S.C. § 7194(a). R. 1, 4. Citronelle stated in its application that it wanted to initiate a tertiary enhanced recovery project which could yield 30 to 60 million barrels of crude oil, but that it could not pay for the substantial costs of starting a tertiary project. R. 4. It estimated that the project would "require the expenditure of about $60 million before effectiveness of the [tertiary] technique [could] be determined." R. 5. To finance the project, Citronelle requested immediate relief from price controls, retroactive to June 1, 1979, to enable it to sell its lower-tier crude oil at market prices. R. 5–6, 1505. The application estimated that the requested relief would give the Unit approximately $25 million over the remaining 27 months of price controls. R. 46. Citronelle proposed placing the revenues resulting from the requested relief in escrow and spending them only on a tertiary project. R. 5.

Citronelle admitted in its application that its exception request was "unprecedented" because "[i]t is not predicated on the type of hardship or inequity showing that has heretofore formed the basis for relief in producer exception requests." R. 57. The Unit alleged that the relief sought was justified because it would result in the production of a great amount of oil and thereby promote national energy policies of encouraging domestic production and reducing dependence on foreign producers. R. 4–5, 29–31. The Unit stated that it could not finance the project itself because the Unitization and Operating Agreements do not permit the Unit to borrow money or otherwise raise capital. R. 12–13. The Unit contended as of August 8, 1979, that existing programs to encourage production, such as the then-applicable marginal property rule and the tertiary incentive program, were either inapplicable or inadequate to fund this project. R. 31–35. These circumstances allegedly resulted in a "gross inequity" justifying relief because failure to grant relief would result in the frustration of a national energy objective and prevent development of a major oil field. R. 41–42.

**C. Regulatory Changes**

At the same time that its application for exception relief was pending, Citronelle was lobbying agency rulemakers to amend the marginal property rule. The rule in effect when the application was filed al-

lowed lower tier oil to be sold at upper tier prices if, *inter alia,* the oil came from below 8,000 feet and the average daily production of the marginal property was less than 35 barrels. *See* 44 Fed.Reg. 22,010, 22,013–14 (April 12, 1979). Citronelle contended that this limitation was inequitable because its wells produced less than 40 barrels per day from depths in excess of 10,000 feet.[6] *See* R. 32.

Citronelle's initial request of DOE to amend the rule was unsuccessful. *See* R. 1177–79. It then brought an action on July 29, 1979, against DOE which attacked the failure of the rule to include properties producing less than 40 barrels per day at depths in excess of 10,000 feet. *Weathers v. DOE,* No. TY–39–301–CA (E.D.Tex.); *see* R. 3229–36. A temporary restraining order was entered on August 24, 1979, which permitted the Unit to take advantage of the marginal property rule, but required the Unit to deposit the incremental revenues in escrow, pending DOE action. R. 3229–31.

On July 14, 1980, DOE amended the marginal property rule essentially in the manner that Citronelle desired. *See* 45 Fed. Reg. 47,406 (July 14, 1980). The amendment was made retroactive to June, 1979, the effective date of the original marginal property rule. *Id.* at 47,406. This amendment enabled Citronelle to receive the full benefits of the marginal property rule, which totalled approximately $28.6 million in 1979 and 1980. R. 6018.[7]

## D. DOE Decisions on Citronelle's Application

On October 8, 1980, the Office of Hearings and Appeals ("OHA") issued a Proposed Decision and Order granting, in part, Citronelle's request for exception relief. R. 1505. The Proposed Decision first recognized that several events had occurred since the initial application which affected Citronelle's financial position. First, the marginal property rule had been amended with a financial benefit to the Unit of $26.6 million, net of severance taxes and base royalty payments.[8] Proposed Decision at 5, R. 1509. Second, Citronelle had certified three tertiary recovery projects for the Unit, which would enable Citronelle to recoup up to $60 million in tertiary incentive revenues.[9] *Id.* The result of these two events was that "the crude oil sales revenues available to Citronelle for its tertiary recovery program, absent any exception relief, ha[d] increased substantially." Proposed Decision at 6, R. 1510.

Even with these increased revenues, however, OHA found that exception relief was warranted, primarily because a "combination of events ... precluded Citronelle's beginning the tertiary project at a time when it could take full advantage of the January 1, 1980 effective date of the provisions of 10 C.F.R. § 212.78(a)(2) [the tertiary incentive program]." Proposed Decision at 7, R. 1511. If the marginal property revenues had been available to

---

6. The basis for this argument is that the original rule allowed properties with higher production levels to qualify if their depth was greater, based on the following schedule:

| Average completion depth in feet | Average daily production per well |
|---|---|
| 2,000 – 4,000 | 20 barrels or less |
| 4,000 – 6,000 | 25 barrels or less |
| 6,000 – 8,000 | 30 barrels or less |
| 8,000 or more | 35 barrels or less |

44 Fed.Reg. at 22,014. The rationale for this depth schedule was that production costs increase as depth increases. Citronelle contended that it was inequitable not to extend this schedule to its next logical point: 10,000 feet or more, with average daily production of less than 40 barrels per well.

7. Most of Citronelle's marginal property revenues were released from escrow pursuant to a

November 6, 1980, Order in the *Weathers* case. R. 3235. According to the terms of this Order, all funds in demand accounts were to be paid to the Unit within 30 days, and all funds in time deposits were to be paid to the Unit within 10 days of their next maturity date. *Id.* The funds were in certificates of deposit that matured on January 18, 1981. R. 1654, 5139. Most of the funds were distributed on January 26, 1981. R. 3224.

8. DOE estimated the $26.6 million figure for the October 8, 1980 Proposed Decision. The actual figure for 1979 and 1980, before deducting taxes and royalty payments, was $28.6 million. R. 6018.

9. This certification request was later withdrawn, and Citronelle never qualified as more than one property. *See infra* at 1412.

Citronelle starting in June, 1979, when the marginal property rule went into effect for other producers, the Unit could have accumulated enough capital to start a tertiary recovery project by January 1, 1980, and take full advantage of the tertiary incentive program. Proposed Decision at 8, R. 1512. In fact, soon after the marginal property rule was amended in Citronelle's favor, OHA found, "the firm began tertiary operations." *Id.* The net effect was that "Citronelle was effectively denied access to the incentive provisions of § 212.78 between January 1, 1980 and approximately September 1, 1980." *Id.* This "combination of events ... produced a gross inequity which warrants exception relief." *Id.* OHA tailored the relief to the gross inequity it had found: "[W]e will grant an exception ... to permit Citronelle to certify production as tertiary incentive crude oil [at market prices] effective January 1, 1980, the date upon which producers were generally permitted to begin making such certifications under the tertiary incentive program." *Id.* This relief would yield Citronelle $22.5 million in revenues. *Id.*

OHA then considered the remainder of Citronelle's exception request: to recertify at market prices all price-controlled crude oil produced and sold by the Unit between June 1, 1979, and December 31, 1979, which would net Citronelle $15.9 million in revenues. OHA found that this additional relief was not warranted because Citronelle was going to receive approximately $49.1 million in revenues by September 30, 1981, that it could not have anticipated when it filed its application for exception relief: $26.6 million in marginal property revenues and $22.5 million in exception relief through the tertiary incentive program.

Although Citronelle had asserted that it needed $74.1 million to commence a tertiary project, OHA found that the Unit only anticipated spending $46 million by the end of 1981, and additional relief was therefore unnecessary and unwarranted. Proposed Decision at 9, R. 1513.[10]

Based on these findings, OHA proposed granting in part Citronelle's application for exception relief. The Proposed Order allowed Citronelle to certify oil sold during the period from January 1, 1980, until September 30, 1981, as "tertiary incentive crude oil" at market prices. Proposed Decision and Order at 11, R. 1515. Those revenues were required to be applied to allowable expenses of the Unit's tertiary recovery project. *Id.*

Citronelle was dissatisfied with this decision and filed a Notice of Objection to the Proposed Decision and Order on October 10, 1980. R. 1522. On October 31, 1980, the Unit moved for immediate issuance of an interim decision and order. R. 1532. This motion asked OHA to make immediately effective, in modified form, the exception relief recommended in the Proposed Decision and Order by issuing an Interim Decision and Order. R. 1533.[11] An immediate interim decision was needed because the Unit, for tax reasons, had to decide before the end of the year whether to proceed with the project and, consequently, whether to distribute to the owners the marginal property revenues, which could otherwise be used for the tertiary project. R. 1534–36. In support of its request to modify the Proposed Decision and Order, the Unit contended that "the funds available to it for use in the tertiary project are far less than the $49.1 million indicated in

---

10. Citronelle also argued that it would only be able to use $10.9 million of the $26.6 million in marginal property revenues, because $3.7 million was required to be distributed to the royalty interest owners, and $12 million was needed to compensate the working interests. Proposed Decision at 9–10, R. 1513–14. OHA found that there was insufficient justification for distributing $12 million to the working interest owners, rather than devoting it to the tertiary project. The Unit's problems in retaining this money were merely "internal difficulties" which were

not the proper subject of exception relief. Proposed Decision at 11, R. 1515. Even assuming that the $3.7 million had to be paid to the royalty interest owners, OHA found that $45.4 million ($49.1–$3.7 million) remained to cover the estimated $46 million in initial tertiary expenses. *Id.*

11. Under 10 C.F.R. § 205.69A (1981), an Interim Decision and Order may be issued if public interest considerations strongly favor interim relief. An Interim Order has immediate effect.

the Proposed Decision and Order" because it "does not take into account the substantial Windfall Profit Tax and income tax liabilities that have accrued against those funds as a direct and unavoidable consequence of the time that has passed during which the Unit was denied access to the incentive tertiary program." R. 1540. The actual amount available to the Unit, according to its motion, was between $31.1 and $36.6 million, which was far less than the $49.1 million estimated in the Proposed Decision or than the $60 million needed for the project. R. 1535. Citronelle therefore requested that OHA expand the proposed relief in order to remedy more fully the gross inequity found in the Proposed Decision and give the Unit enough funds to undertake the project. R. 1549.[12]

In response to Citronelle's motion, OHA issued an Interim Decision and Order on December 15, 1980. *The 341 Tract Unit of Citronelle Field,* 7 DOE ¶ 82,523 (1980) (hereinafter "Interim Decision"), R. 1830. OHA rejected the Unit's request to expand the relief granted in the Proposed Decision and Order, stating: "We are unable to conclude at this stage in the proceeding that the full amount of exception relief requested by the Citronelle Unit is necessary or appropriate at this time." 7 DOE at 85,-057. OHA did find, however, that public interest considerations warranted granting Citronelle's request for interim relief. *Id.* The interim relief approved, to take effect immediately, was essentially the same relief suggested in the Proposed Decision, with two minor modifications. *Id.*[13]

OHA recognized, however, that "the exception relief [granted to Citronelle] does not provide the full measure of financing

that the Citronelle Unit claims is necessary to undertake the project." 7 DOE at 85,-058 (footnote omitted). To remedy this deficiency, OHA proposed, *sua sponte,* an alternate form of relief for the Unit. The proposed relief would "allow the Citronelle Unit to fund the project by raising through recertification of the price-controlled crude oil produced from the unit $60 million in net revenues," without limit on date of prior production, "provided that the necessary [ownership] interest agree to undertake the proposed project." *Id.* This relief was conditioned on the Unit's agreement to waive access to the tertiary incentive program and repay any tertiary incentive revenues they had received through the program. In addition, Citronelle was required to agree to repay the $60 million to DOE if the enhanced recovery project is successful. *Id.* at 85,058–59. The $60 million in revenues was also required to be placed in a special interest-bearing escrow account, and DOE retained the power to approve expenditures. *Id.* at 85,062.

The justification for the alternate relief, OHA found, was that Citronelle was unable to obtain enough capital from either internal or external sources to finance the tertiary project. *Id.* at 85,058. Without financing, the Unit working interest operators would not consent to undertaking the project. *Id.* The alternate relief, in the amount required to fund the initial stages of the project, would induce the working interest owners to approve the project. The initiation of the project, in turn, would "achieve the ... objectives of the tertiary recovery program" and significantly enhance the production of domestic crude oil. *Id.* at 85,058–59. The costs of financing this project would be borne by domestic

---

**12.** Specifically, Citronelle requested that it be allowed to certify all oil sold between January 1, 1980, and September 30, 1981, as "tertiary incentive crude oil" exempt from price controls. R. 1551. Oil sold between June 1, 1979, and December 31, 1979, was to be recertified as "stripper well crude oil," which was also exempt from price controls. *Id.* In addition, the Unit requested that the additional revenues derived from this relief be placed in an interest-bearing escrow account, and that it be allowed to use this money to pay tertiary expenses until March 21, 1983. *Id.*

**13.** The first change was that Citronelle would be permitted to immediately recertify all oil produced between January 1, 1980, and September 30, 1980, as "tertiary incentive crude oil" and place the resulting revenues in an escrow account to use for tertiary expenditures. 7 DOE at 85,057. The second modification was that purchasers of the Unit's crude oil were compensated through the Entitlements Program for the payments made to Citronelle in a slightly different manner. *Id.* at 85,057–58.

refiners through the Entitlements Program and, ultimately, by consumers. *Id.*

The Unit was given ten working days to decide which of the two forms of relief it wanted. *Id.* at 85,059. On December 29, 1980, Citronelle notified OHA by letter that it elected the alternate relief and consented to the conditions placed on the award of relief. R. 1865. On December 31, 1980, OHA issued a second Interim Decision that acknowledged Citronelle's choice and ordered the alternate relief described in the December 15 Interim Decision. *The 341 Tract Unit of the Citronelle Field,* 7 DOE ¶ 81,140 (1980).

Citronelle immediately recertified at market prices price-controlled crude oil it had produced and sold from February, 1977, to February, 1980. R. 1894, 1905. This recertification required Gulf Oil Corporation, which purchased 98% of the Unit's crude oil production, *Interim Decision,* 7 DOE at 85,058, to pay $63.8 million to Citronelle. R. 1893–94, 1905.[14] Under the terms of the Interim Order, Citronelle deposited these revenues in an escrow account. Gulf's entitlements obligation changed by $63.8 million so that it received the $63.8 million through sale of entitlements. The result of this recertification and change in Gulf's entitlements was that the $63.8 million cost was shared by all participants in the Entitlements Program, including plaintiffs and Gulf. *See* R. 1893–94; *Interim Decision,* 7 DOE at 85,058; 46 Fed.Reg. 10,191, 10,195 (Feb. 2, 1981).

At the same time, major refiners, including many of the plaintiffs, were served with copies of the Interim Decision and Order and offered an opportunity to comment. R. 1880. They filed notices of objections and were granted an OHA hearing on the matter. The presiding OHA Hearing Officer told the parties that the December 31 Interim Order was to be considered a modification of the October 8 Proposed Decision and Order, and that they would have an opportunity to file statements of objection and other appropriate motions.

R. 2857–58. On March 2, 1981, Exxon and others filed their Statement of Objections to the Interim Decision and moved for discovery and an evidentiary hearing. R. 3314, 3487.

On June 12, 1981, OHA granted Exxon's Motion for Discovery in part and scheduled an evidentiary hearing to receive testimony on two issues: "(a) the efforts and ability of the Citronelle Unit to obtain the consent of the working interest owners to agree to implement the tertiary recovery project in the absence of exception relief; and (b) the ability of the Citronelle Unit to obtain financing for the tertiary recovery project in the absence of exception relief." *Exxon Co., U.S.A.,* 8 DOE ¶ 82,589, at 85,357 (1981). These two issues were identified as "two essential material factual issues that remain in dispute" because they were critical ingredients of the approval of exception relief. *Id.* at 85,356. OHA held the requested evidentiary hearing on September 9 and 10, 1981. R. 10,368–10,806. In addition to testimony elicited at the hearing, each side submitted documentary evidence and post-hearing briefs, and each side presented oral argument at a November 19, 1981, hearing. R. 11,565–11,653.

Although the record was essentially complete by November, 1981, OHA did not issue its Final Decision and Order until January 31, 1983. *Three Forty One (341) Tract Unit of the Citronelle Field,* 10 DOE ¶ 81,027 (1983). OHA stated that it had reviewed the entire record to determine if the relief granted in the December 15 and 31, 1980, Interim Decisions was appropriate. *Final Decision,* 10 DOE at 82,644. OHA analyzed the evidence presented in connection with the evidentiary hearing and found that the Unit would not have implemented the tertiary project unless it received exception relief. 10 DOE at 82,660, 82,666. OHA also found that Citronelle could not obtain sufficient financing to induce the working interest owners to undertake the project. *Id.* OHA concluded that Citronelle had met its

---

**14.** This amount would yield Citronelle $60 million in net revenues after state severance taxes and windfall profit taxes.

"burden of demonstrating that it experienced a gross inequity as a result of its inability to obtain benefits under the Tertiary Incentive Program." 10 DOE at 82,-644; *see* 10 DOE at 82,666. Accordingly, OHA found that the exception relief granted to Citronelle in the Interim Decisions was "fully warranted in order to provide the appropriate incentives to enable the Citronelle Unit to undertake the enhanced crude oil recovery project on the Citronelle Field." 10 DOE at 82,671. The accompanying Order reaffirmed, with some additions,[15] the December 31, 1980, Interim Order.

### E. This Lawsuit

This action was initiated before OHA issued the Final Decision. On January 22, 1981, Exxon Corporation and other major oil companies instituted an action ("the Exxon suit") against the Department of Energy and others [16] to challenge the December 31, 1980, Interim Decision and Order granting Citronelle's request for exception relief. Citronelle immediately applied to intervene as a defendant to defend the relief it received. On January 30, 1981, the parties stipulated to stay the action pending the issuance of a final decision by DOE. Dkt. 10. As part of that stipulation, the parties in the Exxon suit agreed to establish a special interest-bearing escrow account separate and apart from the escrow account established to fund Citronelle's ter-

tiary recovery project. Citronelle agreed to deposit into the special escrow account an amount equal to plaintiffs' additional entitlement obligations arising from the December 31, 1980, Interim Decision.[17]

On March 10, 1981, plaintiffs Texaco, Inc., Atlantic Richfield Company, and Chevron, USA, Inc. filed an essentially identical suit ("the Texaco suit") against the Department of Energy to contest the December 31, 1980, Interim Decision and Order. After a request for a temporary restraining order was denied, the parties in the Texaco suit agreed to stay the action until the Final Decision issued. The Texaco parties, however, did not establish a special escrow account for this litigation.

After the Final Decision was issued, the parties in the Exxon action filed cross motions for summary judgment and extensive supporting materials. The parties in the Texaco action also filed cross motions for summary judgment and adopted the arguments made in the briefs in the Exxon action. After lengthy oral argument and additional briefing, those motions are ready for decision.[18]

### III. Analysis

#### A. Standard of Review

■ The standard of judicial review of DOE decisions is set forth in section 211(d)(1) of the Economic Stabilization Act of 1970.[19] It provides:

15. One significant change is that DOE has required Citronelle to deposit into the escrow account revenues from the sale of the Unit's tertiary crude oil production. *Final Decision*, 10 DOE at 82,667, 82,672. The Unit may use these revenues for tertiary project expenditures if more than $60 million must be spent before determining the commercial success of the project. *Id.; see also The 341 Tract Unit of the Citronelle Field*, 9 DOE ¶ 82,571 (1982). This particular aspect of the Final Decision was not challenged by plaintiffs.

16. The Secretary of Energy, the Administrator of the Economic Regulatory Administration, and the Director of the Office of Hearings and Appeals were also named as defendants.

17. Pursuant to the stipulation, Citronelle deposited approximately $14.2 million in this account.

18. The plaintiffs' complaint alleged several grounds for overturning the Final Decision in addition to the arguments considered below. Plaintiffs' counsel stated at oral argument, however, that plaintiffs have abandoned all claims not addressed in their summary judgment briefs. October 2, 1984 Oral Argument Tr. at 29–30. Accordingly, the Court has only considered those claims raised in the plaintiffs' briefs.

19. This standard was adopted for DOE orders by section 5 of the Emergency Petroleum Allocation Act of 1973, as amended. 15 U.S.C. § 754(a)(1). *Powerline Oil Co. v. FEA*, 536 F.2d 378, 387 n. 18 (Temp.Emer.Ct.App.1976).

[N]o order of [DOE] shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

12 U.S.C. § 1904 note. As interpreted by the Temporary Emergency Court of Appeals in light of administrative law principles, this standard requires that a district court give "great deference" to agency action on requests for exception relief. *See, e.g., City of Long Beach v. DOE,* 754 F.2d 379 at 386 (Temp.Emer.Ct.App.1985); *Powerine Oil Co. v. FEA,* 536 F.2d 378, 386 (Temp.Emer.Ct.App.1976); *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1404 (Temp.Emer.Ct. App.1975); *Husky Oil Co. v. DOE,* 582 F.2d 644, 653 (Temp.Emer.Ct.App.1978); *Bonnaffons v. DOE,* 646 F.2d 548, 550, 552 (Temp.Emer.Ct.App.1981). The reason for this deference is that "[a]dministrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise." *Pasco, Inc. v. FEA,* 525 F.2d at 1404; *see also City of Long Beach v. DOE, supra,* at 386.

■ This principle also requires this Court to "show 'great deference to the interpretation given [a] statute by the officers or agency charged with its administration;' and 'when the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.'" *Union Oil Co. of California v. DOE,* 688 F.2d 797, 807 (Temp. Emer.Ct.App.1982) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983); *see also City of Long Beach v. DOE, supra,* 385, 386; *General Crude Oil Co. v. DOE,* 585 F.2d 508, 515 (Temp.Emer.Ct. App.1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *Husky Oil Co. v. DOE,* 582 F.2d at 653. This deference to agency interpretations of statutes and regulations is not without limits, for a court cannot defer to an interpretation which is plainly erroneous or inconsistent with the statutes or regulations. *See Koch*

*Refining Co. v. DOE,* 658 F.2d 799, 802–03 (Temp.Emer.Ct.App.1981); *Tenneco Oil Co. v. FEA,* 613 F.2d 298, 302 (Temp.Emer.Ct. App.1979).

■ To overcome the deference given to DOE decisions, plaintiff has the burden of proof, *Powerine Oil,* 536 F.2d at 387, and must make a "clear showing" that the decision exceeds the agency's authority or is based on findings not supported by substantial evidence. *Bonnaffons v. DOE,* 492 F.Supp. 1276, 1281 (D.D.C.1980), *aff'd,* 646 F.2d 548 (Temp.Emer.Ct.App.1981); *see New England Petroleum Corp. v. FEA,* 455 F.Supp. 1280, 1296 (S.D.N.Y.1978). It is indicative of the difficulty of making this showing that no court has overturned an agency grant of exception relief as being in excess of its authority.

**B. OHA's Authority**

Plaintiffs argue that the Final Decision and Order was beyond OHA's authority to award exception relief, as defined by statutes and regulations. OHA found that Citronelle suffered a "gross inequity" because anomalous circumstances prevented Citronelle from receiving the regulatory benefits of the Tertiary Incentive Program. *Final Decision,* 10 DOE at 82,650. Without effective access to tertiary incentive revenues, OHA also found, Citronelle "would be unlikely to undertake [a] tertiary project with the result that important national energy objectives would be frustrated." 10 DOE at 82,651. Plaintiffs allege that each of these conclusions is erroneous and that the award of exception relief is therefore beyond DOE's authority.

The power to make adjustments to regulations in order to prevent "special hardship, inequity or unfair distribution of burdens" has existed ever since price controls were first enacted. *See* Economic Stabilization Act of 1970, § 203, 12 U.S.C. § 1904 note; 15 U.S.C. § 766(b); 42 U.S.C. § 7194. After establishing the three statutory criteria, Congress left it to the agency's discretion to define them further. For example, in 1976, Congress directed the Federal Energy Administration ("FEA"), DOE's

predecessor, to "establish criteria and guidelines by which ... special hardship, inequity, or unfair distribution of burdens shall be evaluated." ECPA, § 104, 15 U.S.C. § 766(b). The Senate Conference Report makes clear that the purpose of the guidelines was to "assist applicants in making presentations to the agency" and not to limit the flexibility of the agency in awarding exception relief.

> It is not the intention of the conferees ... that these provisions require the FEA to anticipate all situations in which relief may be appropriate in the future, since the exceptions process is designed in substantial measure to resolve factual situations which could not have been and were not contemplated at the time the general statutory or regulatory programs were adopted.

S.Conf.Rep. No. 1119, 94th Cong., 2d Sess. 60, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2005, 2027, 2037. In response to this directive, the FEA promulgated the Exceptions and Appeals Guidelines on November 18, 1976. *See* 7 Energy Mgmt. (CCH) ¶ 80,003–80,046.

Although the exceptions power has been largely self-defined, Congress did make its dissatisfaction known when the agency was interpreting its authority too narrowly. When Congress established the Department of Energy in 1977, it granted DOE the same power to grant exception relief as had been exercised by the FEA. *Compare* 42 U.S.C. § 7194 (exception relief power of DOE) *with* 15 U.S.C. § 766 (exception relief power of FEA). Congress emphasized, however, that it was dissatisfied with the FEA's narrow interpretation of its power to make adjustments.

> The criteria for adjustments included in both the House and Senate bills are identical to those included within the original Federal Energy Administration Act of 1974. Their reenactment, however, should not be taken as a validation of FEA's narrow application of the standards.... [T]he standards specified by Congress [must] be fully and accurately applied, with each criterion given its separate and intended meaning. The Managers want to emphasize that adjust-

ments should be granted, consistent with the other purposes of the relevant Acts, whenever an applicant meets any one of the three grounds for relief, and that relief ... should be of the degree and duration necessary to alleviate the special hardship, inequity, or unfair distribution of burdens.

H.R.Conf.Rep. No. 539, 95th Cong., 1st Sess. 84–85, *reprinted in* 1977 U.S.Code Cong. & Ad.News 854, 925, 955–56.

■ This review of the legislative history of DOE's authority to grant exception relief demonstrates that Congress intended DOE to have broad powers, within the confines of the statutory language, in order to enable DOE to respond to changing circumstances and effectuate the purposes of federal energy statutes. Federal courts ruling on appeals from exception relief decisions have generally upheld DOE exceptions decisions and have only reversed the agency when it failed to award complete relief to an applicant that met the statutory standards. *See, e.g., Twin City Barge & Towing Corp. v. Schlesinger,* 603 F.2d 197, 208–10 (Temp.Emer.Ct.App.1979); *Husky Oil Co. v. DOE,* 582 F.2d 644, 653 (Temp. Emer.Ct.App.1978); *New England Petroleum Corp. v. FEA,* 455 F.Supp. 1280 (S.D. N.Y.1978); *Amoco Oil Co. v. DOE,* 490 F.Supp. 1016 (D.D.C.1980).

In *Bonnaffons v. DOE,* 492 F.Supp. 1276 (D.D.C.1980), *aff'd,* 646 F.2d 548 (Temp. Emer.Ct.App.1981), for example, Shell Oil Company attacked an OHA decision ordering Shell, pursuant to a grant of exception relief, to supply gasoline to a Puerto Rican distributor and purchase gasoline from Puerto Rican refiners. The District Court found that "Congress has repeatedly recognized that an exceptions process, by its very nature designed to resolve unforeseen or unforeseeable factual situations in a complex, technical and highly volatile field, must remain open ended. Although the agency has promulgated regulations and guidelines to assist in the review of exception applications, even the general language of these administrative aids is not meant to anticipate all possible forms of

appropriate relief." 492 F.Supp. at 1280 (footnotes omitted). Judge Gesell found it "insignificant" that the agency lacked express authority to order Shell to purchase gasoline, because the order was consistent with statutory goals and not prohibited by any statute or regulation. 492 F.Supp. at 1281. He concluded: "The fact that the precise form of relief granted was unusual and perhaps unprecedented does not carry it beyond the legitimate scope of agency authority." 492 F.Supp. at 1282 (footnote omitted). On appeal, the Temporary Emergency Court of Appeals upheld the lower court's broad definition of the agency's powers to award exception relief, including the power to act without express authority, even though the court recognized that the agency's authority in this situation was "problematic." 646 F.2d at 552.

The primary criteria for the exercise of OHA's exceptions power, other than these court decisions and the statutory standards, are the Exceptions and Appeals Guidelines. 7 Energy Mgmt. (CCH) ¶ 80,-003–80,046. The Guidelines "provide a summary of the standards which [DOE] has consistently applied to its consideration of the wide range of exception applications which it has received." 7 Energy Mgmt. (CCH) ¶ 80,004. Although they contain only "broad, general standards," id., and are not to be exceptions power, other than these court decisions and the statutory standards, are the Exceptions and Appeals Guidelines. 7 Energy Mgmt. (CCH) ¶ 80,-003–80,046. The Guidelines "provide a summary of the standards which [DOE] has consistently applied to its consideration of the wide range of exception applications which it has received." 7 Energy Mgmt. (CCH) ¶ 80,004. Although they contain only "broad, general standards," id., and are not to be applied literally, see Husky Oil Co. v. DOE, 582 F.2d at 651, the Guidelines do clarify the statutory standards which applicants for exception relief must satisfy.

■ The Guidelines specify two situations in which OHA will find that a "gross inequity" exists. First, OHA will find gross inequity "where the application of a specific regulatory provision to a particular factual setting significantly frustrates the realization of a major national energy objective." 7 Energy Mgmt. ¶ 80,006. This standard requires OHA to "weigh competing policy objectives and seek to reconcile them by determining the optimal balance in the particular case." Id. Second, "[t]he FEA has also approved exception relief on grounds of gross inequity where a person is adversely affected in a significant manner as a result of the application of a regulatory provision whose purpose has been seriously distorted by anomalous circumstances." Id. An applicant need only satisfy one of these two standards in order to show that a gross inequity exists. See id.; Twin City Barge & Towing Corp. v. Schlesinger, 603 F.2d at 201. Plaintiffs allege that OHA's finding that these standards were satisfied was erroneous.

■ First, plaintiffs allege that important national energy objectives were not frustrated by the application of the tertiary incentive program ("TIP") regulations to Citronelle's circumstances. They stress the TIP had certain limited objectives and that the exception relief awarded to Citronelle was inconsistent with those objectives. According to plaintiffs, the TIP was intended to give producers a limited amount of "front-end" money to evaluate the feasibility of a tertiary project. Plaintiffs argue that DOE chose not to eliminate all risks inherent in a tertiary project and not to make eligibility for relief in the program depend upon the financial circumstances of the producer. Moreover, plaintiffs state, DOE limited the amount of available TIP revenues to $20 million per property in order to limit the scope of the TIP.

Plaintiffs' argument misconstrues the most significant purposes of the TIP. Congress identified tertiary projects as deserving "high priority," but did not design an incentive program itself, because it recognized that "any statutory classification is likely to be either so narrowly stated as to exclude important emerging technologies or so broadly stated as to create a loophole of undiscernible proportions." S.Conf.Rep.

No. 1119, 94th Cong., 2d Sess. 71, *reprint-ed in* 1976 U.S.Code Cong. & Ad.News 2027, 2047. Accordingly, Congress gave DOE "greater flexibility to provide for such incentives," *id.*, through the following directive: "[DOE] shall promulgate such amendments to [price regulations] as shall ... provide additional price incentives for bona fide tertiary enhanced recovery techniques." 15 U.S.C. § 757(j)(1). In promulgating the TIP, DOE was required to effectuate this directive. The regulatory limitations identified by plaintiffs were merely the means that DOE chose to achieve the statutory end, and not the end itself. Even assuming that the grant of exception relief to Citronelle was inconsistent with the limitations imposed by the TIP regulations, it was within OHA's authority to prevent the frustration of a major national energy objective—promoting tertiary projects to increase domestic crude oil production—at the expense of those regulatory limits.[20]

Plaintiffs' argument also overlooks the intended function of the regulatory limitations of the TIP. The intent of the rulemakers was explained when the final regulations were promulgated:

> This incentive is intended to provide producers with the financing necessary to evaluate the feasibility of utilizing [tertiary] techniques in situations that involve a high investment risk. In the event of a favorable evaluation, we believe a producer should be able to secure the financing necessary to enable it to continue the project. Accordingly, we have decided that a limit of twenty million dollars should be placed on the total amount of recoupable allowed expenses with respect to a particular property.

44 Fed.Reg. 51,148, 51,150 (Aug. 30, 1979) (footnote omitted). The twenty million dollar cap was chosen because DOE believed that that amount was sufficient to enable

producers to evaluate the feasibility of a tertiary project and convince investors that it was a prudent investment. *See* 44 Fed. Reg. 18,677, 18,679 (March 29, 1979). By giving producers enough front-end money, DOE subsidized producers through the high-risk early phases of a tertiary project, when investors presumably found it uneconomic to invest in tertiary projects.

This description of the functions of the tertiary incentive program regulations demonstrates that the relief awarded to Citronelle was in fact consistent with the functions and goals of the TIP. As is explained at greater length below, OHA found that Citronelle could not undertake the tertiary project without exception relief, because neither internal nor external sources of financing were available to pay for the initial, high-risk phases of the project. The award of exception relief was intended to cover the initial costs of the project, up to the point where the effectiveness of tertiary techniques could be determined, and not to cover the entire cost of the project. *See Final Decision* 10 DOE at 82,640, 82,666; *see also* R. 10,830 (Citronelle estimate that project would cost $133 million, not including project operation and maintenance costs). In addition, the regulatory requirement that producers prepay expenditures instead of receiving front-end money directly was not violated by DOE's establishment of an escrow account for Citronelle. The use of an escrow account for tertiary project expenditures is not intrinsically different than the manner in which larger producers used TIP revenues: "Many energy companies were also in a position to make use of the 'in-house' expenditures and prepayment provisions of the Tertiary Incentive Program and thereby receive and keep funds that can earn interest for a number of years before being expended." *Final Decision,* 10 DOE at

**20.** Plaintiffs argue in their reply brief that the award of relief was inconsistent with other national energy objectives and that DOE improperly weighed competing policies by promoting tertiary projects over all other goals. The Court is satisfied that DOE properly considered the other objectives of the federal energy statutes before granting relief. *See, e.g., Final Decision, Bonnaffons, supra,* where the Temporary Emergen-

cy Court of Appeals stated: "Congress and the Temporary Emergency Court of Appeals (TECA) have recognized that the statutory objectives of the EPAA are inconsistent and that the accomplishment of some might result in the sacrifice of others.... [I]n appropriate circumstances the frustration of only one objective can support exception relief." 646 F.2d at 553–54 (citations omitted).

82,640. In this respect, the escrow account put Citronelle on equal footing with larger companies.

■ Thus, the grant of exception relief is consistent with the general limitations of the TIP and is not, as plaintiffs argue, a new regulatory program created for the exclusive benefit of the Cirtonelle Unit. More importantly, the award of relief was consistent with the primary purpose of the TIP: to encourage the development of tertiary recovery projects and thereby increase domestic production of crude oil. It is not the province of this Court to second-guess DOE in its balancing of federal energy objectives and determination to advance one at the possible expense of others. *See Bonnaffons v. DOE*, 646 F.2d at 552–54; *New England Petroleum Corp. v. FEA*, 455 F.Supp. at 1298–99. DOE acted within its authority in determining that Citronelle's failure to receive TIP benefits and failure to undertake a tertiary project would frustrate a major national energy objective. Having made this finding, DOE had the authority to grant Citronelle exception relief.

■ Plaintiffs also make the separate but related argument that OHA could not award Citronelle more than $20 million in exception relief because that amount was the maximum Citronelle could receive from the TIP. Plaintiffs allege an applicant for exception relief cannot receive more in relief than the amount it would have realized if it had fully participated in the program from which an exception was sought. In support of their argument, plaintiffs cite *Energy Cooperative, Inc.*, 10 DOE ¶ 81,017 (1983).

In *Energy Cooperative*, the applicant sought relief under the Crude Oil Buy/Sell and Entitlements Programs, both of which were designed, at least in part, to give refiners equitable access to crude oil. *See* 10 DOE at 82,585–86. DOE found that the award of relief "must therefore be equal to

the financial benefit which ECI would have realized if it had possessed access to price-controlled crude oil in the same proportion as the average refiner in the United States." *Id.* at 82,598. This statement, upon which plaintiffs rely, means that an award of relief should be matched to the primary goals of the program and should remedy the inequity by placing the applicant in the same position as similar entities. The award of relief to Citronelle was consistent with these principles. As was discussed in more detail above, Citronelle's award of relief was consistent with the goals of the TIP, just as ECI's award was required to be consistent with the goals of the Entitlements Program. The $20 million limit was not a primary purpose of the program, and DOE can make an exception to such a limit to promote more important goals.

■ Moreover, OHA found that other oil producers in Citronelle's situation could have become eligible for more than $20 million in relief:

> The Tertiary Incentive Program could readily be utilized by firms that had a controlling interest in a number of contiguous properties. Such companies were then able to initiate tertiary projects on a field-wide basis. Therefore, these firms could multiply $20 million in regulatory benefits by the number of properties involved in the field-wide tertiary project. A number of tertiary projects sponsored by the larger companies were eligible to receive substantially in excess of $20 million.

*Final Decision*, 10 DOE at 82,643; *see also* 10 DOE at 82,640–41. There is evidence in the record that other producers certified multiple tertiary projects on the same field and thus became eligible to receive more than $20 million in TIP benefits. *See, e.g.*, R. 13,042 (Amoco certified four projects on one field); R. 13,048 (Texaco certified three projects on one field).[21] Although Citronelle applied to have three separate

---

**21.** Citronelle has cited the statement of a Standard Oil Company of Indiana representative which it reads as stating that Standard Oil received between $30 and $40 million in TIP benefits on one project. *See* R. 11,653. Although

Citronelle's interpretation of this statement is plausible, other readings are also possible. The Court need not resolve this issue because the other evidence cited in the text is adequate to support its conclusion.

projects certified, OHA apparently treated Citronelle as one property. *See Proposed Decision,* R. 1509 & n. 3; R. 1454; R. 13,022–23. Nonetheless, it is evident from the passage quoted above and the similar one quoted in the margin [22] that OHA believed a larger oil company developing a similar field could qualify for more than $20 million in benefits for the same tertiary project. Thus, the award of more than $20 million in exception relief is consistent with the principle that applicants can be put in the same position as similarly-situated entities. *See Twin City Barge & Towing Corp. v. Schlesinger,* 603 F.2d 197, 202 (Temp.Emer.Ct.App.1979).

Plaintiffs also allege that DOE incorrectly found that a gross inequity existed because of the "anomalous and unique situation that occurred which prevented the Citronelle Unit from participating in the Tertiary Incentive Program." *Final Decision,* 10 DOE at 82,648. Plaintiffs make three attacks on this finding: 1) Citronelle's circumstances cannot be considered anomalous, primarily because the Unit informed the TIP rulemakers of their circumstances and the rulemakers did not make allowances in the rule for their circumstances; 2) Citronelle was not barred from participating in the TIP because they did receive some benefits from the program; 3) even if they were barred from the program, the TIP regulations did not cause the inequity. Each of these contentions will be examined in turn.

■ First, there is sufficient evidence in the record to support OHA's conclusion that Citronelle's situation was anomalous or unusual. Citronelle is unusual among oil producers in its ownership structure, with control of the Unit vested in approximately 850 working interest owners, and less than 15% of the ownership interest controlled by major oil companies. R. 4, 12. As a result of this ownership structure, as defined by the Unitization Agreement and the Unit Operating Agreement, R. 62–98, 199–235, the Unit has difficulty undertaking such ordinary business activities as raising capital internally, retaining revenues, and obtaining loans. *See* R. 12–13. The proposed tertiary project itself is unusual because of the magnitude of the initial investment required and the large amount of oil that would be produced if the project is successful. R. 1511. Finally, Citronelle was denied the benefits of the marginal property rule, apparently wrongfully,[23] which prevented Citronelle from using marginal property revenues to start a tertiary project. *See* R. 1512. DOE properly found this combination of circumstances and events to be anomalous enough to warrant exception relief. *See* R. 1512; *Interim Decision,* 7 DOE at 85,056; *Final Decision,* 10 DOE at 82,639, 82,648.

■ Plaintiffs do not argue at length against this finding. Instead, they aver that because Citronelle informed DOE of its unusual facts during the TIP rulemaking proceeding, and DOE declined to modify the rule in favor of Citronelle, "those same facts cannot later be said to have been unanticipated and cannot later form the basis for a finding of anomalous circumstances." Plaintiffs' Reply Br. at 10. This Court need not consider this argument, however, because plaintiffs did not raise it before OHA.[24] It is not the prov-

---

**22.** [A]n energy-related company that was able to access the Tertiary Incentive Program by certifying a number of tertiary projects on a number of contiguous properties in a field-wide tertiary project would in the long run prefer the $20 million in additional "front-end" revenues per property available under the Tertiary Incentive Program.... *Final Decision,* 10 DOE at 82,640–41.

**23.** The basis for Citronelle's suit in *Weathers v. DOE,* No. TY–79–301–CA (E.D.Tex. filed July 29, 1979), was that DOE improperly failed to extend the marginal property rule to apply to producers like Citronelle. DOE consented to the entry of injunctive relief, *see* R. 1183–85, and even-

tually changed the rule to apply to Citronelle. *See* 45 Fed.Reg. 47,406 (July 14, 1980).

**24.** Plaintiffs have cited several places in the record where it was brought to OHA's attention that Citronelle had participated in the TIP rulemaking, but the precise argument now made by plaintiffs, quoted above, was not made before OHA. Plaintiffs' only relevant allegation was their statement that DOE adopted the $20 million per property limitation despite Citronelle's objections. R. 11,118–20.

Plaintiffs have attempted to justify this omission by alleging that OHA relied on anomalous circumstances for the first time in the Final

ince of a reviewing court to consider arguments which an administrative agency never had reason to consider. *City of Long Beach v. DOE*, 754 F.2d 379 at 391 (Temp. Emer.Ct.App.1985); *Tenneco Oil Co. v. DOE*, 475 F.Supp. 299, 307 (D.Del.1979); *Unemployment Compensation Commission v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946).

■ Plaintiffs' second contention is that Citronelle was not barred from participating in the TIP, because Citronelle could, like any other producer, obtain access to the benefits of the TIP. In fact, plaintiffs note, Citronelle did qualify for approximately $1.1 million in TIP benefits. *See* R. 3700, 12,250. This fact, however, has little meaning by itself. DOE found that the regulatory incentives of the TIP were not well structured for providing incentives to Citronelle. *Final Decision*, 10 DOE at 82,-640. The problem addressed by the grant of exception relief was that the TIP did not give Citronelle adequate incentives to undertake its tertiary project, and thus failed to achieve the purpose intended by Congress. The fact that Citronelle received a small incentive does not mean that the TIP gave it adequate incentives.

■ Plaintiffs' more general assertion is that Citronelle could participate in the same manner as other producers. DOE properly found, however, that Citronelle was not similar to other producers, and that those dissimilarities prevented the Unit from making full use of the TIP. *Final Decision*, 10 DOE at 82,640. The typical tertiary project was controlled by an energy company, which had the financial resources to raise front-end capital, spread its risks among several projects, and prepay expenses to a subsidiary company. *Id.* In addition, a typical producer had adequate access to other price-controlled crude oil from unrelated properties

so that it could always recertify enough price-controlled oil as tertiary incentive oil to fund its tertiary expenses. *Id.* Citronelle's ownership structure prevented it from raising capital, R. 12–13, and it did not own a subsidiary to which it could prepay expenses. Moreover, Citronelle lacked access to other price-controlled crude oil and could not spread the risk by investing in other tertiary projects. These differences limited Citronelle's ability to undertake a tertiary project when the TIP began. Without these differences, Citronelle would have been able to obtain access to a greater amount of TIP benefits and would have had the financial incentive to undertake a tertiary project. Thus, in practical terms, Citronelle did not have equal access to TIP benefits.

■ Plaintiffs' third argument is that because Citronelle's difficulties were not caused by any DOE regulation, exception relief is not warranted. In support of their argument, plaintiffs refer to the general principle, established by prior DOE decisions and the Guidelines, that exception relief is only warranted if the applicant shows that the inequity it suffers is caused by a DOE regulatory requirement. *See Wallace & Wallace Chemical & Oil Corp.*, 2 FEA ¶ 80,655; *Exceptions and Appeals Guidelines*, 7 Energy Mgmt. (CCH) ¶ 80,-006. Plaintiffs' argument has superficial appeal, because no specific or identifiable regulation caused the inequity suffered by Citronelle. DOE has recognized, however, that the principle of causality, originally conceived for DOE programs that impose regulatory burdens, has a different meaning for DOE programs designed to provide participants with affirmative regulatory benefits. *See Dow Chemical U.S.A.*, 8 DOE ¶ 81, 01 (1981); *Union Oil Co. of California*, 9 DOE ¶ 81,008; *New England Petroleum Corp. v. FEA*, 455 F.Supp. 1280, 1297–99 (S.D.N.Y.1978); *Final Deci-*

---

Decision, so that plaintiffs had no reason to raise the argument before the Final Decision. *See* Plaintiffs' October 30, 1984, Letter to the Court at 7. In fact, both the Proposed and Interim Decisions were based on the premise that "due to an *anomalous series of events,* the working interest owners were unable to imple-

ment an enhanced crude oil recovery project." *Interim Decision,* 7 DOE at 85,056 (emphasis added); *see also Exxon Co., U.S.A.,* 8 DOE ¶ 82,589, at 85,345 (1981). Plaintiffs' assertion that the finding of anomalous circumstances was made for the first time in the Final Decision is incorrect.

*sion,* 10 DOE at 82,650–51. The failure of an applicant to receive a generally available regulatory benefit may result in the frustration of the purposes of the regulatory program and could constitute a gross inequity. *See Dow Chemical,* 8 DOE at 82,907. Moreover, if a regulatory incentive program has restrictive access criteria which bar an applicant from receiving a regulatory benefit to which it would otherwise be entitled, an inequity may exist warranting exception relief. *See Union Oil Co. of California,* 9 DOE at 82,553. In these situations, the principle of casuality is satisfied because the structure or access criteria of the DOE regulatory incentive program, rather than any specific regulation, causes the applicant to be denied benefits, which may be inequitable in comparison to other firms which receive the regulatory benefit.

■■■ The structure of the TIP established, in effect, three specific requirements that producers had to meet in order to receive TIP benefits: "(1) the producer had to have access to price-controlled crude oil; (2) expenses that qualified for recoupment had to be incurred and paid prior to certifying the price-controlled crude oil as tertiary incentive crude oil; and (3) the producer had to have access to sufficient revenues to self-finance (through internal or external sources of capital) 25 percent of the portion of expenses that were eligible for recoupment." *Final Decision,* 10 DOE at 82,643. As noted above, through anomalous circumstances, Citronelle did not have access to enough capital to initiate a tertiary project and begin receiving TIP benefits. *See Proposed Decision* at 8, R. 1512. Thus, Citronelle was barred from the TIP by the restrictive access criteria, which caused inequity because the purpose of the TIP was frustrated by Citronelle's exclusion and because Citronelle was unable to receive the regulatory benefits available to other producers. *See Final ·Decision,* 10 DOE at 82,640, 82,651. Since these inequities were caused by the structure of the TIP, the principle of causality has been satisfied.

■■■ Plaintiffs' final argument relating to OHA's authority is that because of the decontrol of crude oil and refined petroleum products on January 28, 1981, and the subsequent termination of the tertiary incentive program, OHA had no authority to grant Citronelle final relief in January, 1983. It is clear that OHA had statutory authority to issue a final decision. Section 18 of the EPAA, the act which gave the President the discretionary authority to regulate petroleum prices and allocations until September 30, 1981, provides:

> such expiration [of the Act's authority] shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date, nor any ... proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date.

15 U.S.C. § 760g. This section gives OHA the authority to complete administrative proceedings, including requests for exception relief, after decontrol.

■■■ Plaintiffs maintain that OHA had no authority to subsidize any tertiary expenses incurred after March 31, 1981. Plaintiffs' argument misconstrues the basis for the Final Decision. OHA awarded relief "to remedy a gross inequity that occurred prior to decontrol." *Final Decision,* 10 DOE at 82,656. In other administrative proceedings, DOE has granted exception relief after decontrol for inequities that occurred before decontrol. *See, e.g., City of Long Beach v. DOE,* at 383–384 (Temp.Emer.Ct.App.1985); *USA Petroleum Corp.,* 23 FERC ¶ 61,016 (1983).[25] As DOE

---

**25.** Plaintiffs cite several decisions in which DOE held that it lacked authority after decontrol to grant adjustments to the Executive Order mandating decontrol and to certain past regulatory programs. *See, e.g., Atlantic Gasohol Fuels Co.,* 7 DOE ¶ 81,286 (1981); *Industrial Fuel & Asphalt of Indiana, Inc.,* 8 DOE ¶ 82,595 (1981). The decisions on which plaintiffs rely, however, are not persuasive because they involve requests for allocations of oil. DOE found that it lacked authority to order prospective allocations because its allocation authority had ended, and because oil could now be obtained on the free market without DOE intervention. *See Circle R Convenience Stores, Inc.,* 8 DOE ¶ 81,093, at 82,-867 (1981). Citronelle, however, received interim relief before decontrol, which was con-

stated in its Ruling on the effect of decontrol on subsequent recertification of oil, decontrol "does not abrogate the right that accrued to a firm to establish prices for crude oil prior to January 28, 1981." DOE Ruling 1981–1, 46 Fed.Reg. 12,945, 12,947 (Feb. 19, 1981). Similarly, Citronelle had a right to exception relief that accrued before decontrol. In order to award the benefits due to Citronelle and remedy the gross inequity, the Interim and Final Decisions authorized Citronelle to recertify oil produced and sold before January 28, 1981, which provided Citronelle with enough front-end capital to proceed with its tertiary recovery project. The fact that this money could be spent after decontrol does not vitiate the award of relief. Under the TIP, producers could prepay expenses and recover them immediately "even though the tertiary enhanced recovery project might not be begun for a period of months or even years." *Union Oil Co. of California v. DOE*, 688 F.2d 797, 801 (Temp.Emer. Ct.App.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983); *see Final Decision*, 10 DOE at 82,640. There is little practical difference between prepaying expenses and placing money in escrow to pay future expenses—in both situations, the money will be used after decontrol. As DOE recognized in the Final Decision, energy companies that prepaid expenses to a subsidiary could keep TIP revenues for years before actually spending them. 10 DOE at 82,640.

Aside from the grant of money, DOE's only continuing involvement in the project is to approve expenditures from the escrow account. *See Final Decision*, 10 DOE at 82,672. This requirement is analogous to the reporting requirements for producers with tertiary enhanced recovery projects using prepaid expenses, which must continue reporting to DOE until the prepaid monies are actually used. *See* 46 Fed.Reg. 20,508, 20,509–10 (April 3, 1981). In short, the award of relief properly remedied an inequity occurring prior to decontrol, and

the post-decontrol effects of the award of exception relief are no different than similar effects under the TIP. Thus, the fact that Citronelle's award of relief was made final after decontrol and allowed Citronelle to pay tertiary expenses after decontrol does not render the award outside OHA's authority.

## C. Substantial Evidence

Plaintiffs also attack several factual findings in the Final Decision as being unsupported by substantial evidence. Specifically, plaintiffs dispute the finding that Citronelle would have been unable and unwilling to undertake the tertiary project without exceptions relief. Plaintiffs allege that Citronelle was prepared to start a tertiary project without exceptions relief, and that Citronelle could have obtained financing to commence the project.

█ The key factual finding made by OHA was that Citronelle would not have undertaken a tertiary project in the absence of exception relief. *See Final Decision*, 10 DOE at 82,643, 82,651. Substantial evidence supports this conclusion. The basis for the application for exception relief was that Citronelle needed relief in order to undertake the tertiary project. *See* R. 4–7. Subsequent statements of Citronelle representatives confirm this fact. R. 1492; 1642–43; 5129–30; 9889. The evident reason for their refusal to go forward, as explained in more detail below, was that Citronelle lacked the capital needed to undertake a tertiary project.

Plaintiffs offer two factual arguments to rebut this finding. First, they contend that the Unit approved certain tertiary project expenditures before the issuance of the October 8, 1980 Proposed Decision, and those expenses indicated that Citronelle was already initiating a tertiary project without relief. The record reflects, however, that the only measures approved before October 8 were some preliminary ones: the drilling of four carbon dioxide injection

firmed by the Final Decision. *See City of Long Beach, supra,* slip op. at 383–384 (proposed decision awarding relief for pre-decontrol inequity made final after decontrol). Moreover, the

exception relief cured a past inequity—denial of regulatory benefits—which could not be cured on the free market.

wells and the completion of associated tests and laboratory studies, at an approximate cost of $3 million. *See* Letter from J. Peter Leudtke, Attorney for Citronelle, to Melvin Goldstein, Director, OHA (August 13, 1980), R. 1491–92; *see also* R. 8007, 8012. Counsel for Citronelle represented to DOE that these measures were undertaken "to minimize the lead time that is necessarily involved in initiating a major $CO_2$ project," and that these measures did not indicate that the Unit was willing or able to undertake the entire project without relief.[26] R. 1491–92. Plaintiffs do not offer substantial evidence that controverts this explanation.

The second factual argument advanced by plaintiffs to rebut OHA's finding is that Citronelle had committed itself to a tertiary project in November, 1980, and would have authorized $20 million in tertiary project expenditures without relief. Plaintiffs base their argument on the consensus of the Unit Operators' Committee on November 5, 1980, to go forward with Phase I of a tertiary project, and on the subsequent Poll Vote Proposal ("P.V.P.") requesting authorization to spend $20 million on the project over the next year. Although the November 5 meeting came less than a month after OHA's Proposed Decision to award Citronelle $22.5 million in exception relief, plaintiffs argue that this proposal was not contingent on the receipt of exception relief because it contained no express contingency clause. *See* P.V.P. 497, R. 8015. It is evident, however, from the transcript of the November 5 meeting, R. 5063, and the references in P.V.P. 497 to the Proposed Decision, *see* R. 8016–17, that the $20 mil-

lion expenditure would be funded largely through the proposed exception relief.[27] Indeed, one Unit official stated that in the event the OHA revoked the Proposed Decision, the Operators' Committee would need to resubmit P.V.P. 497 to the working interest owners for approval of the expenditure without relief. R. 1641–42. Moreover, although P.V.P. 497 was recommended by the Operators' Committee, it was not approved because of the lack of a contingency clause. R. 5183–85; 8018; 9886. P.V.P. 497–A, identical to P.V.P. 497 with the addition of a contingency clause, was then passed. *Id.* These events refute plaintiffs' assertion that Citronelle was prepared to undertake the tertiary project without relief.[28]

■ Plaintiffs also contend that Citronelle was able to finance and undertake a tertiary project without exception relief. OHA found that the project could not have been financed without exception relief. *Final Decision,* 10 DOE at 82,666. First, OHA concluded that "internal sources of funds alone would [not] have provided the ownership interest of the Citronelle Unit with the requisite financial resources to undertake the project in the absence of exception relief." *Final Decision,* 10 DOE at 82,660. OHA had before it substantial evidence to support this conclusion. The evidence showed that the Unit needed at least $60 million in front-end capital funds in order to initiate the project, R. 25; 1465–73; 1513; 1517; 1642, and that the Unit's revenues from secondary production—its source of internal funds—had been declining in recent years. *See* R. 3222–26; 3241–64.[29] In addition, the availability of

---

**26.** The largest expenditure—$2.1 million—was only authorized after it became apparent that Citronelle would receive substantial marginal property revenues. *See* Poll Vote Proposal 494, R. 8012; R. 5183.

**27.** According to P.V.P. 497, $12 million would be covered by tertiary incentive revenues made possible by the Proposed Decision, and $8 million would be covered by marginal property revenues. R. 8015.

**28.** Plaintiffs attempt to explain the defeat of P.V.P. 497 and the substitution of P.V.P. 497–A by alleging that Bart Chamberlain, who had voted for 30 percent of the working interest,

reversed his position and vetoed P.V.P. 497 only because he learned that OHA was going to award Citronelle substantial interim exception relief. However, Mr. Chamberlain testified that he voted against P.V.P. 497 because of its lack of an express contingency clause. R. 9886. The evidence cited by plaintiffs in support of their explanation why he changed his vote, *see* R. 1693, does not prove their point.

**29.** As discussed at greater length below, *see infra* pages 1419–1421, the Final Decision failed to make proper consideration of the availability of the marginal property revenues in determining the level of relief that is appropriate. It is

revenues from the tertiary project was in doubt because of the risk inherent in tertiary projects. Thus, Citronelle could not generate enough capital from secondary revenues to initiate the project on its own, and the potential revenues from the tertiary project, given its cost and risk, were inadequate to induce the working interest owners to undertake the project. OHA thoroughly analyzed testimony presented by plaintiffs' expert that contradicted these conclusions and rejected it because plaintiffs' expert overstated projected revenues from the tertiary project and underestimated or ignored the problem of initial capital expenditures. *Final Decision,* 10 DOE at 82,660–63. The Court finds no reason to disturb OHA's conclusions.

OHA also found that external sources of funds were not available in sufficient amounts to provide the front-end capital necessary to induce the working interest owners to undertake the project. *Final Decision,* 10 DOE at 82,663–66. Three possible sources of external funding were considered and rejected by the OHA: a drilling fund, conventional bank financing, and financing by the major working interest owners. According to the testimony of one of plaintiffs' experts, a drilling fund could be formed if working interest owners put their individual ownership interests into a limited partnership in exchange for outside investors funding the tertiary project. "In order for the fund to be formed, Mr. Johnson [plaintiffs' expert] maintained that the critical ingredient was to induce enough of the working interest owners to contribute a sufficient portion of the ownership interest of the Citronelle Unit to the drilling fund to ensure that the drilling fund had effective control of the Unit's operations." *Final Decision,* 10 DOE at 82,664. OHA rejected this suggested method of financing for three reasons: first, there would be no inducement for working interest owners to put their interests in the fund, and greater

incentives to be non-participating "free riders," since the Unitization Agreement provided that an owners' percentage of revenues could not be reduced for non-participation. Second, there was no likely candidate for general partner to manage the fund. Third, OHA doubted the credibility of Mr. Johnson's testimony, based on his demeanor and his lack of familiarity with the problems created by the Unit's organizational structure. *See* 10 DOE at 82,664–65. OHA's assessment that Mr. Johnson was not a credible witness, based on his live testimony, is entitled to deference, for this Court cannot assess his demeanor from a written transcript. *See* 5 K. Davis *Administrative Law Treatise* § 29:26 (2d ed. 1984). Moreover, his testimony does show a lack of familiarity with Citronelle's ownership structure. *See, e.g.,* R. 10,162–64. OHA's rejection of the drilling fund is supported by substantial evidence and adequate reasons. Given DOE's expertise in petroleum financing, this Court is unwilling to second-guess the agency's determination that a fund is not feasible when there is evidence in the record to support its conclusions.

The second possible source of external financing considered by OHA was conventional bank financing. Experts on both sides testified that a bank would only lend Citronelle funds based on secondary reserve projections, and it was uncontroverted that no bank would lend Citronelle the full $60 million required at the outset to undertake the tertiary project. *See* R. 4330–32; 6815; 10,135–41. OHA also noted that Bart Chamberlain testified for Citronelle that any bank loan could only be financed on a recourse basis, and that the ownership interests would be unwilling to agree to such a loan. *Final Decision,* 10 DOE at 82,663. Thus, the evidence supports OHA's conclusion that conventional bank financing was inadequate to meet Ci-

---

evident from the Proposed Decision, however, that the marginal property revenues and revenues from secondary production did not provide Citronelle with $60 million in capital. *See Proposed Decision* at 7–11, R. 1511–15. Moreover, the Final Decision apparently accepts Ci-

tronelle's contention that "even with the revision in the definition of a marginal property, it still did not have the requisite financial resources to undertake the ... project." *Final Decision,* 10 DOE at 82,638 (footnote omitted).

tronelle's needs and would not obviate the need for exception relief.

The third suggested financing method was to raise capital from the major working interest owners. OHA found that there was no evidence in the record, other than speculation, that the major working interest owners would finance the tertiary recovery project. Plaintiffs apparently do not contest this finding.

In conclusion, the Court finds that substantial evidence existed to support the factual findings of OHA. While plaintiffs have presented evidence that might lead a court to decide issues differently, were it writing on a clean slate, they have not demonstrated that any of OHA's findings lacked substantial support.

### D. Amount of Relief

■ Although the Court finds that OHA's decision to award relief was within its statutory authority and its findings were supported by substantial evidence, the agency's decision must be set aside because the amount of relief awarded was excessive and outside the agency's authority. While DOE has discretion to fashion an appropriate remedy once an inequity is found, including the discretion to fashion large and unprecedented awards, *see Bonnaffons v. DOE*, 492 F.Supp. at 1280–82; *cf. Asamera Oil (U.S.), Inc.*, 10 DOE ¶ 81,031, at 82,699 (1983) (one refiner has received over $150 million in exception relief), that discretion is not without limits. The amount of exception relief awarded must only be "of the degree and duration necessary to alleviate the special hardship, inequity, or unfair distribution of burdens." H.R.Conf.Rep. No. 539, 95th Cong., 1st Sess. 85, *reprinted in* 1977 U.S.Code Cong. & Ad.News 925, 956. The Temporary Emergency Court of Appeals has used this standard to reverse DOE exception decisions when the relief awarded was inadequate to alleviate the serious hardship or

gross inequity found to exist. *See Twin City Barge & Towing Corp. v. Schlesinger*, 603 F.2d 197, 208–10 (Temp.Emer.Ct. App.1979); *Husky Oil Co. v. DOE*, 582 F.2d 644, 652–53 (Temp.Emer.Ct.App.1978). It follows that a DOE decision that exceeds what is necessary to alleviate a gross inequity must also be reversed.

The Final Decision specifies that the basis for its finding of gross inequity was that Citronelle was unable to undertake the tertiary enhanced recovery project without exception relief. *Final Decision*, 10 DOE at 82,651, 82,666, 82,671. OHA also found that Citronelle needed $60 million in front-end capital in order to fund the initial, at-risk stages of the project and induce the working interest owners to agree to initiate the project. *Final Decision*, 10 DOE at 82,639, 82,665; *Interim Decision*, 7 DOE at 85,058. To remedy this lack of capital, the amount of relief awarded was intended to yield $60 million in net revenues, after taxes, to be placed in the escrow account. *See Final Decision*, 10 DOE at 82,671; *Interim Decision*, 7 DOE at 85,059, 85,062.

The problem with this amount of relief is that it evidences a disregard for a crucial change in the circumstances of Citronelle after it filed its initial application in 1979. In 1979 and 1980, after filing its application for exception relief, Citronelle received, directly or in an escrow account, approximately $28.6 million in benefits from the marginal property rule.[30] Citronelle repeatedly represented to OHA that it would be willing to apply most, if not all, of these marginal property revenues to the tertiary recovery project along with an award of exception relief. R. 1026–27; 1042–43; 1076–77; 1098; 1170; 1220.[31] For example, in one submission, Citronelle stated that it would need between $42 and $53 million in exception relief if the marginal property rule were not changed, and only $28–$39 million in exception relief if the

---

**30.** June 29, 1981, Response of the Citronelle Unit to Interrogatories and Document Requests at 6, R. 6018. When the Proposed Decision was issued on October 8, 1980, the amount was estimated to be $26.6 million, net of severance taxes and base royalty payments. R. 1509.

**31.** *See also* October 2, 1984, Oral Argument Tr. at 120, 232; Memorandum of Defendant-Intervenor (341 Tract Unit of the Citronelle Field) To Supplement The Transcript Of Oral Argument On October 2, 1984, at 22, 29.

rule were changed and the relief were fully utilized for the tertiary project. R. 1098. The Proposed Decision specifically recognized the availability of $26.6 million in marginal property revenues for the tertiary project and calculated the award of relief with these revenues in mind. *See* R. 1513–15. Although Citronelle's objections to the Proposed Decision asserted that less than $26.6 million would be available because of income taxes, *see* R. 1542–44, the Unit maintained that $15.1 million would be available. R. 1535, 1544. Moreover, after the Proposed Decision was issued, the working interest owners approved a $20 million expenditure on the tertiary project in P.V.P. 497–A, which contemplated the use of $8 million of the marginal property revenues. *See* R. 5183; 8018.

Despite the availability of about one-fourth of the capital needed by Citronelle, OHA awarded the Unit the full $60 million in front-end capital without requiring the Unit to use the available marginal property revenues for the tertiary recovery project. This decision cannot stand because the amount of relief awarded was more than the amount required to remedy the inequity. Citronelle originally needed $60 million in front-end capital to fund its project, and the inequity Citronelle experienced was, in effect, that it lacked $60 million in capital. The change in the marginal property rule, however, gave Citronelle a large amount of available capital—perhaps $15 million.[32] With Citronelle expressing its willingness to use this capital for the project, it should have been clear to OHA that about $45 million ($60 million needed front-end capital less $15 million marginal property revenues available) would remedy the inequity Citronelle experienced. In essence, Citronelle asked for $60 million in capital to fund the initial stages of the tertiary project and ended up with $75 million in capital. Such largesse is beyond the authority of OHA to award exception relief because it was far more than was "necessary to alleviate the . . . inequity."

A possible reason why the Final Decision did not require Citronelle to use the marginal property revenues is that these revenues were distributed to the owners in early 1981, because the Interim Decision and Order did not require Citronelle to apply those revenues to the tertiary project. *See* R. 3222–24.[33] This change in circumstances, however, does not support the Final Decision. The Interim Decision was incorrect and beyond the agency's authority in failing to deduct the amount of capital available to Citronelle in marginal property revenues from the amount of relief requested in order to arrive at the amount of relief required. Although those funds were distributed to the Unit owners by the time of the Final Decision, they were available at the crucial time—when interim relief was granted. OHA's erroneous Interim Decision cannot become justified because that decision erroneously caused a change in the underlying facts.

Moreover, the Citronelle owners' choice to distribute the marginal property funds after the Interim Decision was their discretionary business decision. The fact that the money was distributed to the individual owners is not an inequity which warrants giving them more capital than they would have needed but for the distribution of marginal property funds. Both before and after the distribution, OHA should have credited Citronelle with having those funds available, whether they were in escrow or in the pockets of the individual owners. OHA's failure to do so was beyond its authority. This error cannot be remedied without knowing the exact amount of the marginal property revenues that was available to Citronelle in December, 1980, after windfall profit taxes, for use in the tertiary project. On remand, OHA must calculate this figure and deduct the amount of available marginal property revenues from $60 million in order to determine how much exception relief was needed to give Citro-

---

32. *See* R. 1535, 1544.

33. *See also* Memorandum of Defendant-Intervenor (341 Tract Unit of the Citronelle Field) To Supplement The Transcript Of Oral Argument On October 2, 1984, at 20–21.

nelle a total of $60 million in front-end capital.

One other deficiency in the Final Decision merits attention on remand. OHA rejected the use of bank financing because a bank would not advance Citronelle the full $60 million required to fund the initial stages of the project, but it stated that partial bank financing might be available. *Final Decision,* 10 DOE at 82,665. The Final Decision does not specify whether Citronelle actually could have obtained some capital through bank financing and how much bank financing was available. If Citronelle could have obtained a portion of the capital it needed from a bank, then Citronelle did not need to receive that money in exception relief. The amount of front-end capital Citronelle needed from the exceptions process should have been adjusted to reflect the availability of bank financing. On remand, OHA must determine what amount of bank financing was available to Citronelle, if any, and deduct that amount from the grant of exception relief.

## IV. Conclusion

This matter has been pending for over five years before DOE and this Court, and it is with reluctance that the Court returns it to DOE for another round. Nonetheless, the excessive amount of relief awarded to Citronelle, which was drawn from the pockets of plaintiffs, cannot be countenanced. No matter how reluctant the Citronelle owners may have been to undertake the tertiary project without exception relief, it was not necessary to give them a windfall benefit in order to induce them to proceed. Because of this error, the matter must be remanded to DOE for further proceedings consistent with this opinion. On remand, OHA will have to determine the amount of marginal property revenues and bank financing that was available to Citronelle for use in the tertiary project and deduct that amount from the amount of relief awarded.