EXXON CORPORATION, Cities Service Company, Conoco, Inc., Marathon Petroleum Company, Sun Oil Company of Pennsylvania, the Standard Oil Company (Ohio), Tosco Corporation, Plaintiffs-Appellants,

v.

DEPARTMENT OF ENERGY, Donald P. Hodel, Secretary of Department of Energy, Rayburn Hanzlik, Administrator, Economic Regulatory Administration, Department of Energy, George B. Breznay, Director, Office of Hearings and Appeals, Department of Energy, Defendants-Appellees,

The 341 Tract Unit of the Citronelle Field, Intervenor-Defendant-Appellee (Two Cases).

TEXACO INC., Atlantic Richfield Co., Chevron U.S.A., Inc., Plaintiffs-Appellants,

v.

DEPARTMENT OF ENERGY, Donald P. Hodel, Secretary of Department of Energy, Rayburn Hanzlik, Administrator, Economic Regulatory Administration, Department of Energy, Richard T. Tedrow, Acting Director of Hearings and Appeals, Department of Energy, Defendants-Appellees,

The 341 Tract Unit of the Citronelle Field, Intervenor-Defendant-Appellee (Two Cases).

Nos. 3–38 to 3–43.

Temporary Emergency Court of Appeals.

Argued Oct. 21, 1985.

Decided Aug. 26, 1986.

As Amended Sept. 2, 1986.

Donald B. Craven, with whom Jay L. Carlson, Craig D. Miller, and James B. Altman, Miller & Chevalier, Washington, D.C., Thomas Herlihy, III, Herlihy & Wier, Wilmington, Del., Edward De La Garza, Houston, Tex., Gerald H. Barnes, Tulsa, Okl., Xavier C. Lemond, Houston, Tex., David P. Batow, Findlay, Ohio, Mary Lynn Beck, Philadelphia, Pa., Roderick C. Mac-Kinnon, Cleveland, Ohio, and Wilkes McClave, Santa Monica, Cal., of counsel, were on brief, for Exxon plaintiffs-appellants in Nos. 3–38 & 3–43 and for Exxon plaintiffs-appellees in Nos. 3–39, 3–40, 3–41 & 3–42.

William O. LaMotte, III, and Edmond D. Johnson, Morris, Nichols, Arsht & Tunnell, Stephen H. Bard, White Plains, N.Y., Cynthia P. Weston, Los Angeles, Cal., and Dudley A. Zinke, San Francisco, Cal., of counsel, were on brief for Texaco plaintiffs-appellants in Nos. 3–38 & 3–43 and for Texaco plaintiffs-appellees in Nos. 3–39, 3–40, 3–41 & 3–42.

Thomas H. Kemp, with whom Catherine C. Cook, Charles L. Cope, II, Dept. of Energy, Washington, D.C., were on brief for defendants-appellees in Nos. 3–38 & 3–43 and for defendants-appellants in Nos. 3–39, 3–40, 3–41 & 3–42.

J. Peter Luedtke, with whom William S. D'Amico, William F. Demarest, Jr., Jose P. Ceppi, D'Amico, Luedtke, Demarest & Golden, Washington, D.C., were on brief for intervenor-defendant-appellee in Nos. 3–38 & 3–43 and for intervenor-defendant-appellant in Nos. 3–39, 3–40, 3–41 & 3–42.

Before HOFFMAN, GIGNOUX and LACEY *, JJ.

PER CURIAM:

Led by Exxon Corporation, several major oil companies brought this action to set aside a decision by the Department of Energy ("DOE") awarding $63.8 million in relief from regulatory burdens to an oil producer called the 341 Tract Unit of the Citronelle Field ("Citronelle"). This legal battle between plaintiffs, DOE, and Citronelle hinges on the interrelationship between a series of regulatory programs enacted in the wake of the Arab oil embargo.

## I. Regulatory Framework

### A. Programs

In 1974, acting pursuant to the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751–760h (1982), DOE's predecessor, the Federal Energy Administration ("FEA"), issued regulations controlling the price of crude oil. The regulations divided crude oil into three categories: "old" oil, which was oil drawn from a producing property up to or equaling the amount drawn from that property in the base year 1972, could be sold only at the "lower tier" maximum price; "new" oil, which was oil produced in excess of the base-year level, could be sold at the "upper tier" price; "exempt" oil, which was foreign oil and certain types of domestic oil, could be sold at market prices.

The regulatory system caused competitive distortions because refiners did not have equal access to the old, cheaper crude. The Old Entitlements Program was created to remedy this problem. *See Cities Service Co. v. FEA*, 529 F.2d 1016 (Temp.Emer.Ct. App.1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); 10 C.F.R. § 211.67 (1985). Under this program, refiners had "entitlements" each month to a certain number of barrels of old oil, the number being based on the refiner's

---

* Judge Lacey was present at the oral arguments in this case and participated in preliminary discussions of a decision. He has since resigned from the federal judiciary and, therefore, does not join in this decision.

proportionate share of old oil. In general, if a refiner bought more old oil than that allowed by its monthly entitlements, the refiner would have to buy entitlements from a refiner who had not received as much old oil as it was entitled to in that month.

The Entitlements Program helped to ensure more balanced access to price-controlled oil, but it did not encourage production from operating wells. Congress responded with the Energy Conservation and Production Act ("ECPA"), Pub.L. No. 94–385, 90 Stat. 1125 (codified as amended at 42 U.S.C. §§ 6801–6892 (1982 & Supp. II)). The ECPA gave DOE latitude within which to set prices, and the agency accordingly developed a "marginal property rule" designed to provide an incentive for the increased production of domestic crude oil. *See* 44 Fed.Reg. 22,010 (April 12, 1979). The rule allowed producers, beginning in June 1979, to sell at upper-tier prices crude oil taken from "marginal properties"— properties producing little oil from deep wells at great expense. *Id.* at 22,013–14; *see also* 45 Fed.Reg. 47,406 (July 14, 1980) (amending marginal property rule to include larger volumes of oil taken from deeper wells).

In addition to authorizing the marginal property rule, the ECPA directed DOE to amend its regulations to "provide additional price incentives for bona fide tertiary enhanced recovery techniques." 15 U.S.C. § 757(j)(1)(A) (1982); *see Union Oil Co. of California v. DOE*, 688 F.2d 797, 800 (Temp.Emer.Ct.App.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983); *see also id.* n. 3 ("Tertiary enhanced recovery techniques are higher cost production methods which maximize oil production from a depleting field" by injecting "carbon dioxide, steam, or other substances in order to increase pressures in the oil reservoir and thereby promote production"). Consequently, DOE in 1978 exempted from price controls the increased production of domestic crude oil resulting from a tertiary enhanced recovery project. 43 Fed.Reg. 33,678 (Aug. 1, 1978). The tertiary incentive program was thus formed, encouraging producers to undertake tertiary projects by giving them greater revenues once oil was recovered using tertiary methods.

Yet the encouragement was not enough for all producers. Some still refrained from starting tertiary projects, despite the benefits, because the projects tended to be risky and usually demanded high pre-production costs. *See* 44 Fed.Reg. 18,677 (March 29, 1979). DOE, in response, structured the program "to provide 'front-end' money to producers engaged in the initiation or expansion of tertiary enhanced crude oil recovery projects that involve substantial pre-production expenses and a high risk of failure." *Id.* Front-end money in the amount of $20 million was available for each property, more money being available if a project encompassed more than one property. *Id.* at 18,679.

The final chapter in this regulatory background is the end of price controls itself. On September 30, 1981, the statutory basis for the President's authority to maintain such controls was scheduled to end. *See* 15 U.S.C. § 760g. In an Executive order dated January 28, 1981, President Reagan ordered not only that present price controls be lifted but also that DOE immediately take action to revoke the regulations governing the controls. Executive Order No. 12,287, 46 Fed.Reg. 9909 (Jan. 28, 1981). DOE accordingly ruled that participants in the program could recover only those tertiary incentive expenses incurred, paid, and reported before March 31, 1981. 46 Fed. Reg. 12,945, 12,947 (Feb. 19, 1981). The program, in other words, ended after that date.

## B. *Exception Relief*

The above programs are not implemented rigidly. DOE's exception authority ensures that the strictures of a regulatory program will be applied in as flexible a fashion as is consistent with the goals of the program. The exception authority derives from the following provision of the DOE Act:

The Secretary ... shall provide for the making of such adjustments to any rule, regulation *or order* ... issued under [several federal energy acts], consistent with the other purposes of the relevant Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens....

42 U.S.C. § 7194(a) (1982). The provision seeks to avoid the hardship that would result from a wooden application of rules and thus grants DOE broad discretion in tailoring a program to a situation. Recognizing the necessity of such discretion, courts have accorded great deference to DOE's exercise of its exception authority. *See infra* Part IV.A.

II. *Factual Background*

Citronelle, DOE, and plaintiffs found themselves in this web of programs, struggling over the appropriateness of Citronelle's having been given the equivalent of about $60 million to nudge it into a tertiary recovery project. Plaintiffs, as members of the Entitlements Program, are concerned with such relief for monetary reasons; it involved recertification of price-controlled crude oil to market price levels, which reduced the amount of price-controlled crude reported as received by the Entitlements Program and, consequently, reduced the financial benefits that the program members received from the program. DOE is concerned with the national energy objectives reflected in its regulatory programs, particularly the tertiary incentive program that it induced Citronelle to enter. Citronelle, of course, is concerned with making money and avoiding regulatory burdens.

A. *Citronelle's Application for Exception Relief*

The Citronelle Field is a peculiar entity. It consists of 341 contiguous forty-acre tracts in Mobile County, Alabama. The field is owned by two types of owners: 850 working interest owners that have a voice in the field's operation and 1500 royalty interest owners that do not. A "Unitization Agreement" and a "Unit Operating Agreement" govern management of the Field. The Unitization Agreement allocates the oil produced by the Unit and the expenses of production proportionately among the owners. The Operating Agreement vests control of Unit operations in an "Operators' Committee." Major decisions such as starting a tertiary project require a vote of the Operators' Committee as well as approval by seventy-five percent of the voting interests.

The Citronelle Field produced about five million barrels of oil per year from 1957 through 1972, when production began to drop off steadily. Production in 1978 was down by more than half, and the oil that was recovered cost more to recover because of the sophisticated techniques and equipment necessary to draw the oil out of the depleted field. Citronelle, in 1979, thus turned to the tertiary incentive program as a way of further production.

On August 8, 1979, Citronelle filed with DOE an Application for Exception Relief. In its application, Citronelle stated that it wanted to begin a tertiary project designed to produce from thirty to sixty million barrels of crude oil, but that it could not bear the estimated $60 million cost of starting the project because its Unitization Agreement prohibited capital-raising ventures. Citronelle asked for immediate relief from such price controls so that it could sell its lower-tier crude oil at market prices. Citronelle admitted that its exception request was "unprecedented" because "[i]t is not predicated on the type of hardship or inequity showing that has heretofore formed the basis" for such relief. Citronelle alleged not only that the marginal property and the tertiary incentive programs were either not available to it or inadequate to fund the project, but also that failure to grant relief would frustrate the national energy policy of encouraging domestic production. Thus, Citronelle maintained that there was a "gross inequity" justifying relief.

Simultaneously, Citronelle was lobbying DOE in unrelated proceedings to amend the marginal property rule. Citronelle's

wells at the time were producing less than 40 barrels per day at depths of over 10,000 feet. The rule, in its amended form, allowed lower-tier oil to be sold at upper-tier prices if the average daily production was less than 35 barrels per day and came from below 8,000 feet. Recognizing the arbitrariness of excluding Citronelle from the pricing advantages of the marginal property rule, DOE ultimately amended the rule on July 14, 1980. *See* 45 Fed.Reg. 47,406 (July 14, 1980). Because the amendment was retroactive to June 1979, the effective date of the rule, Citronelle received the full benefits of the marginal property rule, totaling about $28.6 million (before deducting taxes and royalty payments).

### B. *DOE's Decisions on Citronelle's Application for Exception Relief*

Doe issued four decisions regarding Citronelle's application for exception relief—a proposed decision, two interim decisions, and a final decision.

1. *Proposed Decision and Order:* The Office of Hearings and Appeals ("OHA"), to which DOE has delegated its decision-making authority, issued its Proposed Decision and Order on October 8, 1980. OHA found exception relief to be warranted. Citronelle had been precluded from initiating the tertiary program from its effective date of January 1, 1980, because it lacked capital and because of the arbitrary exclusion from the benefits of the marginal property rule. Proposed Decision and Order at 7, Joint Stipulated Record ("J.S.R.") at 834. This combination of events denying Citronelle access to the tertiary incentive program between January 1, 1980, and September 1, 1980, represented "a gross inequity ... warrant[ing] exception relief." *Id.* at 8, J.S.R. at 835.

OHA structured Citronelle's relief to offset the inequity: "[W]e will grant an exception for the single purpose of encouraging and expediting this project and to permit Citronelle to certify production as tertiary incentive crude oil effective January 1, 1980, the date upon which producers were generally permitted to begin making such certificates under the tertiary incentive program" *Id.* The relief would yield about $22.5 million in revenues. Citronelle wanted more relief, but OHA decided that the $22.5 million, plus the expected $26.6 million in marginal property revenues (which actually turned out to be $28.6 million), would be sufficient to get Citronelle started on a tertiary program in 1981. *Id.* at 9, J.S.R. at 836. OHA deemed additional relief before the end of 1981 to be unwarranted.

2. *Interim Decisions:* Unhappy with the proposed decision, Citronelle filed a Notice of Objection to the Proposed Decision and Order on October 10, 1980. On October 31, 1980, Citronelle moved for an interim decision that would immediately implement a modified version of the exception relief in the proposed decision. Tax reasons brought on the need for an interim decision, according to Citronelle, because it had to decide before the end of the year whether to proceed with the tertiary project; and the marginal property funds had to be either distributed or used for the tertiary project. Furthermore, Citronelle argued that the relief should be expanded because the proposed decision did not consider the reduction of the marginal property funds that would result from taxes.

In an Interim Decision and Order issued on December 15, 1980, OHA rejected Citronelle's request to expand the relief granted in the Proposed Decision. *The 341 Tract Unit of Citronelle Field,* 7 DOE ¶ 82,523, at 82,058 (1980). OHA did conclude, however, that public interest considerations warranted granting Citronelle's request for interim relief. The interim relief, which was to take effect immediately, remained essentially the same relief suggested in the Proposed Decision, with two minor modifications. OHA recognized, however, that "the exception relief [approved in the proposed decision] does not provide the full measure of financing that the Citronelle Unit claims is necessary to undertake the project." 7 DOE at 85–058. The agency proposed *sua sponte* an alternative form of relief. The alternative relief would allow

Citronelle to raise $60 million in revenues from recertification of price-controlled crude oil, on certain conditions, including (1) Citronelle's waiving access to any other benefits under the tertiary incentive program, and (2) Citronelle's agreeing to repay the $60 million to DOE if the tertiary project was successful. *Id.* at 85,058–59. The $60 million in revenues also had to be put into an escrow account. *Id.* at 85,059.

The justification for the alternative relief, OHA found, was that Citronelle was unable to obtain enough capital from either internal or external sources to finance the tertiary project. 7 DOE at 85,058. The alternative relief was structured to provide the financing for the initial stages of the project and thereby to induce Citronelle's working interest operators to consent to undertaking the project. *Id.* The initiation of the project, in turn, would "achieve the ... objectives of the tertiary recovery program" and significantly enhance the production of domestic crude oil. *Id.* at 85-058–59.

Citronelle had ten days to decide which form of relief it wanted. After receiving a letter from Citronelle, OHA issued on December 31, 1980, a second interim decision indicating Citronelle's choice of the alternative relief. *The 341 Tract Unit of the Citronelle Field,* 7 DOE ¶ 84,140, at 82,921 (1980). This relief was implemented: Citronelle recertified at market prices price-controlled crude oil that it had produced and sold from February 1977 to February 1980. As a result of this recertification, Gulf Oil, which bought ninety-eight percent of Citronelle's crude during the relevant period, had to pay Citronelle $63.8 million, and Gulf proceeded to receive $63.8 million through sale of entitlements. All members of the Entitlements Program, including Gulf and plaintiffs, therefore shared the $63.8 million cost of recertification.

3. *Final Decision:* Copies of the second Interim Decision were served on major refiners, each of which had an opportunity to comment and to file statements of objections.

On September 9 and 10, 1981 OHA held an evidentiary hearing to receive testimony on two issues: "(a) the efforts and ability of the Citronelle Unit to obtain the consent of the working interest owners to agree to implement the tertiary recovery project in the absence of exception relief; and (b) the ability of the Citronelle Unit to obtain financing for the tertiary recovery project in the absence of exception relief." *Exxon Co., U.S.A.,* 8 DOE ¶ 82,589, at 85,357 (1981). On January 31, 1983, OHA issued its Final Decision and Order. *Three Forty One (341) Tract Unit of the Citronelle Field,* 10 DOE ¶ 81,027, at 82,637 (1983). OHA analyzed the evidence offered at the evidentiary hearing and found that Citronelle would not have implemented the tertiary project unless it had received exception relief. 10 DOE at 82,660–66. Citronelle could not, OHA concluded, obtain sufficient financing to induce its voting owners to approve the project. *Id.* Furthermore, OHA found that the relief did not afford Citronelle a windfall because of the substantial repayment obligation in the alternative relief that it chose. *Id.* at 82,666.

OHA concluded that Citronelle had met its "burden of demonstrating that it experienced a gross inequity as a result of its inability to obtain benefits under the Tertiary Incentive Program." 10 DOE at 82,-644, 82,645–73. Accordingly, OHA found that the exception relief granted to Citronelle in the Interim Decisions was "fully warranted in order to provide the appropriate incentives to enable the Citronelle Unit to undertake the enhanced crude oil recovery project on the Citronelle Field." 10 DOE at 82,671. The accompanying Order reaffirmed, with some additions, the December 31, 1980, Interim Order.

*C. This Lawsuit*

This action began on January 22, 1981, before DOE's Final Decision, when Exxon and other major oil companies brought an action ("the Exxon suit") against DOE and other federal defendants challenging the grant of exception relief to Citronelle. To defend this relief, Citronelle intervened as a defendant. The parties agreed to stay the action pending DOE's Final Decision.

In addition, Citronelle deposited in an escrow account an amount equivalent to plaintiffs' additional entitlement obligations arising from the second interim decision.

Texaco, Inc., and other oil companies filed an identical suit ("the Texaco suit") on March 10, 1981, against DOE. Similarly, the action was stayed pending DOE's Final Decision, although no funds were deposited in an escrow account.

After DOE's final decision was issued, the parties in the Exxon suit filed cross motions for summary judgment. The parties in the Texaco suit also filed cross motions for summary judgment and adopted the arguments made in the Exxon suit. On January 22, 1985, the district court issued an Opinion and Order granting in part plaintiffs' motion and remanding to the agency for further proceedings. *Exxon Corp. v. DOE*, 601 F.Supp. 1395 (D.Del. 1985).

The district court upheld the authority of DOE to grant exception relief and found substantial evidence supporting DOE's grant of exception relief to Citronelle. Reviewing legislative history and case law, the court noted DOE's broad authority to make exceptions that are consistent with its regulatory programs. 601 F.Supp. at 1411. In this instance, the exception to Citronelle was consistent with the goals of the tertiary incentive program. *Id.* at 1412.

The district court held, however, that the amount of relief granted to Citronelle was excessive and beyond the agency's authority. Acknowledging DOE's discretion to fashion large and unprecedented awards, the court attempted to define the limits of that discretion. That amount of relief, the court believed, should be of a degree sufficient to alleviate the inequity. Because this standard has formed the basis for reversal of exception decisions when the relief was inadequate to remedy the inequity, the district court reasoned that a DOE decision exceeding what is necessary to alleviate the inequity also must be reversed. 601 F.Supp. at 1419.

The district court found the relief to be excessive because OHA gave Citronelle the full $63.8 million in revenues without considering alternative sources of capital. Specifically, the district court observed that Citronelle had received about $15 million (after taxes) from the amendment to the marginal property rule. 601 F.Supp. at 1420. Although the marginal property revenues had in fact been distributed to Citronelle's owners in early 1981, before OHA's Final Decision, the court held that the funds nevertheless should have been deducted from the overall grant of exception relief. *Id.* Consequently, the agency had exceeded its authority. *Id.* In addition, the court observed that OHA had assumed that bank financing was unavailable for the project without considering partial financing, an omission that the court also considered improper. *Id.* at 1421.

Citronelle moved for partial reargument, challenging the court's finding of excessive relief; the district court denied the motion. The appeals by Exxon and Texaco plaintiffs (Temp.Emer.Ct.App. Nos. 3–38 & 3–43), and cross-appeals by DOE along with the other federal defendants and by Citronelle (Temp.Emer.Ct.App. Nos. 3–39, 3–40, 3–41, & 3–42) followed. On April 26, 1985, this Court consolidated the appeals.

The Exxon plaintiffs filed a motion to dismiss defendants' appeals in Temp.Emer. Ct.App. Nos. 3–39 & 3–41 on the ground that the appeals are premature and that this Court does not have jurisdiction. On May 22, 1985, this Court issued an order deferring decision on the motion until it considered the merits.

### III. *Issues on Appeal*

A. Whether the award of exception relief to Citronelle is beyond DOE's authority or is not supported by substantial evidence?

B. Whether the amount of the exception award to Citronelle is beyond DOE's authority or is not supported by substantial evidence?

### IV. *Discussion*

A. *Standard of Review*

Section 211(d)(1) of the Economic Stabilization Act of 1970 ("ESA"), sets forth the

standard of judicial review of DOE decisions. It provides: "[N]o order of [DOE] shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." 12 U.S.C. § 1904 note. A "great deference" rule has developed in applying this standard to agency action on requests for exception relief. *See, e.g., City of Long Beach v. DOE*, 754 F.2d 379, 386–87 (Temp. Emer.Ct.App.1985); *Bonnaffons v. DOE*, 646 F.2d 548, 550, 552 (Temp.Emer.Ct.App. 1981); *Husky Oil Co. v. DOE*, 582 F.2d 644, 653 (Temp.Emer.Ct.App.1978); *Powerine Oil Co. v. FEA*, 536 F.2d 378, 385–86 (Temp.Emer.Ct.App.1976); *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1404 (Temp.Emer.Ct. App.1975). The rationale for the deferential review is the administrative expertise of an agency decisionmaker. *See City of Long Beach*, 754 F.2d at 386; *Pasco*, 525 F.2d at 1404.

B. *Appeal by Exxon and Texaco Plaintiffs (Temp.Emer.Ct.App. Nos. 3–38 & 3–43)*

Plaintiffs appeal the part of the district court Opinion and Order that upheld the authority of DOE to grant exception relief to Citronelle. On several grounds, Exxon argues that OHA's final decision was beyond its authority and not supported by substantial evidence.

DOE's exception authority is not new. Since price controls were first enacted, DOE or its predecessor, FEA, has had authority to make adjustments to regulations as a means of preventing "special hardship, inequity or unfair distribution of burdens." 42 U.S.C. § 7194. This provision carried forward the exception authority first created in 1970 by section 202 of the ESA. That provision required the President to provide for the "making of such adjustments as may be necessary to prevent gross inequities." 12 U.S.C. § 1904 note; *see also* ESA §§ 203 & 207, 12 U.S.C. § 1904 note (1982) (present version of the standard that replaced section 202 when it

was deleted in 1971). Congress has left the job of defining these three statutory criteria to the agency. The Exceptions and Appeals Guidelines, which are derived from practices of DOE and its predecessor, set forth the standards that OHA applies in considering applications for exception relief. *See* Exceptions and Appeals Guidelines, 7 Energy Mgmt. (CCH) ¶¶ 80,003–80,046.

The Guidelines offer two types of situations showing a "gross inequity" that would warrant exception relief. The first is "where the application of a specific regulatory provision to a particular factual setting frustrates the realization of a major national energy objective." Exceptions & Appeals Guidelines, 7 Energy Mgmt. (CCH) ¶ 80,006; *see also id.* (in applying this standard, OHA must "weigh competing policy objectives and seek to reconcile them by determining the optimal balance in the particular case"). Second, OHA "has also approved exception relief on grounds of gross inequity where a person is adversely affected in a significant manner as a result of the application of a regulatory provision whose purpose has been seriously distorted by anomalous circumstances." *Id.* Only one of these two standards need be satisfied to justify exception relief. *See id.; Twin City Barge & Towing Corp. v. Schlesinger*, 603 F.2d 197, 201 (Temp.Emer.Ct.App. 1979). Plaintiffs argue that OHA's finding that the appropriate standards were satisfied is beyond its authority and not supported by substantial evidence.

1. *Effect of Rulemakers' Intent on Exception Relief*

■ Plaintiffs' first argument is an implausible one. The argument maintains that OHA can grant exception relief only when the rulemakers of a given regulation expressed an intent for DOE to do so. As the district court observed, however, the relevant law "gave DOE the authority to make exceptions to any of its regulations." 601 F.Supp. at 1400. The statutory requisites are vague and wide-open: the exception relief must be "consistent with the

other purposes of the relevant Act" and, as already discussed, "be necessary to prevent special hardship, inequity, or unfair distribution of burdens." 42 U.S.C. § 7194(a). By its very nature, the exception process must handle problems unanticipated by the rulemaking process. Nothing in the statute, the Exceptions and Appeals Guidelines, or the case law supports plaintiffs' argument that rulemakers' intention defines the scope of DOE's exception authority.[1]

This Court has been sensitive to the need for an expansive reading of DOE's exception power. Indeed, its decisions consistently have upheld DOE's exception decisions and have reversed the agency only when it failed to award complete relief to an applicant that had met the statutory standards. *See, e.g., City of Long Beach,* 754 F.2d at 386; *Bonnaffons v. DOE,* 646 F.2d at 550, 552; *Powerine,* 536 F.2d at 385–86; *Pasco,* 525 F.2d at 1404; *see also, Twin City Barge & Towing Corp.,* 603 F.2d at 208–09 (reversing DOE's denial of exception relief to an applicant that had met the standards); *Husky,* 582 F.2d at 653 (same). These decisions, as the district court recognized, are consistent with Congress' will. *See* 601 F.Supp. at 1409 (quoting H.R.Conf.Rep. No. 539, 95th Cong. 1st Sess. 84–85, *reprinted in* 1977 U.S.Code Cong. & Ad.News 854, 925, 955–56, which explicitly called for a more generous exercise of the exception power by the DOE than had been exercised by the FEA under the same statutory language).

The case that perhaps best reflects our attitude toward DOE's exception authority is *Bonnaffons v. DOE,* 492 F.Supp. 1276 (D.D.C.1980), *aff'd,* 646 F.2d 548 (Temp. Emer.Ct.App.1981). *Bonnaffons* concerned an OHA decision ordering Shell Oil Company, pursuant to a grant of exception relief, to supply gasoline to a Puerto Rican distributor and to buy gasoline from a Puerto Rican refiner. Shell challenged the exception relief as beyond the agency's au-

thority, much as plaintiffs have challenged the $63.8 million in exception relief to Citronelle. At the district court level in *Bonnaffons,* Judge Gesell rejected Shell's challenge squarely. He observed as follows:

> Congress has repeatedly recognized that an exceptions process, by its very nature designed to resolve unforeseen or unforeseeable factual situations in a complex, technical and highly volatile field, must remain open ended. Although the agency has promulgated regulations and guidelines to assist in the review of exception applications, even the general language of these administrative aids is not meant to anticipate all possible forms of appropriate relief.

492 F.Supp. at 1280, *aff'd,* 646 F.2d 548 (Temp.Emer.Ct.App.1981) (footnotes omitted). On appeal, this Court affirmed DOE's broad authority to grant exception relief. *See Bonnaffons,* 646 F.2d at 550, 552.

2. *Effect of Rulemaking in General*

Plaintiffs' second argument is a related one that, although more plausible than the first argument, is still unpersuasive. Emphasizing the rulemaking process that led to the body of regulations governing the tertiary incentive program, the argument has two strands. The first strand of the argument maintains that OHA, in granting the relief, essentially substituted its views for those of DOE's rulemakers. DOE's rulemakers, according to plaintiffs, balanced competing energy goals and thus foreclosed the possibility of OHA changing the terms of the tertiary program.

This argument, like the first, ignores the scope and purpose of DOE's exception power. By definition, such power includes making adjustments to a regulatory program such as the tertiary one so as to avoid, on a particular set of facts, frustration of the program's overall goals. Plaintiff's argument disregards a fundamental principle of administrative law: broad standards result from rulemaking proceedings

---

**1.** Plaintiffs cite several administrative decisions to support its first argument. Brief for Plaintiffs-Appellants at 22–23. We have difficulty

finding support for the argument in these decisions.

and particular decisions result from adjudicatory proceedings. The exception relief here resulted from adjudicatory proceedings that of necessity adjusted the regulatory standards to avoid hardship on Citronelle and, consequently, promoted larger national energy objectives.

 The second strand of this argument highlights Citronelle's participation in the rulemaking that led to the tertiary project. This participation, plaintiffs maintain, precludes a finding that Citronelle's circumstances were unforeseen and, therefore, precludes a finding that the circumstances were anomalous within the meaning of DOE's Exceptions and Appeals Guidelines and its decisions. We disagree.[2] Plaintiffs offer an administrative decision, *Gulf Oil Corp.*, 10 DOE ¶ 81,011, at 82,553 (1982), as its primary authority on this point. Selectively quoting from this decision, plaintiffs maintain that the case stands for the proposition that Citronelle cannot receive exception relief because of its rulemaking participation. A more complete quotation from this decision establishes that plaintiffs are wrong:

> The exceptions process is designed to address situations which were so unusual or anomalous as to have been unanticipated by the drafters of the regulations, *or* situations where the circumstances of a particular firm caused it to experience a serious hardship, inequity, or unfair burden as a result of compliance with the regulations. . . .
>
> We have also approved exception relief on "gross inequity" grounds where a person or firm is adversely affected in a significant manner as a result of the application of a regulatory provision whose purpose has been seriously distorted by anomalous circumstances. . . .
> In this type of case we have required that the situation be unusual with regard to the particular applicant, since issues regarding the general application of

DOE regulations are properly determined in rulemaking proceedings.

*Id.* at 82,556 (emphasis added; citations omitted). Thus, the case does not support the proposition that participation in the rulemaking process precludes Citronelle from exception relief.

### 3. *Causality Principle*

Plaintiffs argue that exception relief is not warranted because Citronelle's difficulties were not caused by any DOE regulations. This argument is more subtle than the first two. It depends on a principle of causality that has evolved in DOE decisions and the Exceptions and Appeals Guidelines. The principle ensures that exception relief is granted only if the applicant shows that the inequity it suffers is caused by a DOE regulatory requirement. *See Wallace & Wallace Chemical & Oil Corp.*, 2 FEA ¶ 80,655 (1975); Exceptions and Appeals Guidelines, 7 Energy Mgmt. (CCH) ¶ 80,006 ("Exception relief has been approved only upon a showing that the application of [a] DOE regulatory requirement in a particular factual setting results in a serious hardship or gross inequity.").

Citing *Wallace*, plaintiffs have voiced the causality argument before OHA, before the district court, and now in its brief to this Court. In *Wallace*, FEA relied on the causality principle to deny an oil firm entitlement benefits that it had requested in an exception application. Having encountered difficulties with bank financing, the firm had made the entitlements request to finance the construction of a new refinery. The plan, as FEA saw it, was designed so "that the firm [would] be issued entitlements which it would sell and thereby augment its overall corporate income enabling it to continue with its refinery development plans." *Wallace*, 2 FEA at ¶ 81,019.

Building new refineries, in a general sense, furthers national energy objectives.

---

**2.** The district court refused to consider this argument, holding that Exxon had failed to raise it before the OHA. 601 F.Supp. at 1413 & n. 24 (citing *City of Long Beach v. DOE*, 754 F.2d 379, 391 (Temp.Emer.Ct.App.1985), for the proposition that a reviewing court should not consider arguments that an administrative agency never had reason to consider). We need not determine whether the argument is properly before us because we are persuaded that it lacks merit.

Building a refinery, however, is hardly analogous to entering a risky program of sophisticated oil-production methods, particularly because Congress took the trouble to develop a specific program to encourage such production. Neither OHA nor the district court had much trouble distinguishing the *Wallace* decision. OHA stated:

> While the lack of the requisite degree of causality certainly played a part in the denial of exception relief in that case, it is apparent from a careful reading of the *Wallace and Wallace* precedent that exception relief was not granted to the firm primarily because it had not met its burden of proof that the entitlements program was affecting its expansion project any differently from projects proposed by other refiners. If the firm had been able to demonstrate that the operation of the Entitlements Program had an anomalous or disproportionate effect on its operations and such a situation would frustrate important energy goals, then the FEA might have approved exception relief for the firm. In the present case, however, the Citronelle Unit, due to its lack of capital resources, was effectively precluded from receiving any regulatory benefits provided under the Tertiary Incentive Program.

10 DOE at 82,650 (footnote omitted). Similarly, the district court concluded as follows:

> Plaintiff's argument [that *Wallace* precludes exception relief] has superficial appeal, because no specific or identifiable regulation caused the inequity suffered by Citronelle. DOE has recognized, however, that the principle of causality, originally conceived for DOE programs that impose regulatory burdens, has a different meaning for DOE programs designed to provide participants with affirmative regulatory benefits. *See Dow Chemical U.S.A.*, 8 DOE § 81,01 [sic] (1981); *Union Oil Co. of California*, 9 DOE ¶ 81,008 (1981); *New England Petroleum Corp. v. FEA*, 455 F.Supp. 1280, 1297–99 (S.D.N.Y.1978); *Final Decision*, 10 DOE at 82,650–51. The failure of an applicant to receive a generally available

regulatory benefit may result in the frustration of the purposes of the regulatory program and could constitute a gross inequity. *See Dow Chemical*, 8 DOE at 82,907. Moreover, if a regulatory incentive program has restrictive access criteria which bar an applicant from receiving a regulatory benefit to which it otherwise would have been entitled, an inequity may exist warranting exception relief. *See Union Oil Co. of California*, 9 DOE at 82,553. In these situations, the principle of causality is satisfied because the structure or access criteria of the DOE regulatory incentive program, rather than any specific regulation, causes the applicant to be denied benefits, which may be inequitable in comparison to other firms which receive the regulatory benefit.

The structure of the T[ertiary] I[ncentive] P[rogram] established, in effect, three specific requirements that producers had to meet in order to receive T[ertiary] I[ncentive] P[rogram] benefits: "(1) the producer had to have access to price-controlled crude oil; (2) expenses that qualified for recoupment had to be incurred and paid prior to certifying the price-controlled crude oil as tertiary incentive crude oil; and (3) the producer had to have access to sufficient revenues to self-finance (through internal or external sources of capital) 25 percent of the portion of expenses that were eligible for recoupment." *Final Decision*, 10 DOE at 82,643. As noted above, through anomalous circumstances, Citronelle did not have access to enough capital to initiate a tertiary project and begin receiving T[ertiary] I[ncentive] P[rogram] benefits. *See Proposed Decision* at 8, R.1512. Thus, Citronelle was barred from the T[ertiary] I[ncentive] P[rogram] by the restrictive access criteria, which caused inequity because the purpose of the T[ertiary] I[ncentive] P[rogram] was frustrated by Citronelle's exclusion and because Citronelle was unable to receive the regulatory benefits available to other producers. *See Final Decision*, 10 DOE

at 82,640, 82–651. Since these inequities were caused by the structure of the T[ertiary] I[ncentive] P[rogram], the principle of causality has been satisfied.

601 F.Supp. at 1414–15.

■ Approaching the causality principle from another angle, plaintiffs argue that Citronelle was not effectively precluded from participating in the tertiary program and that, therefore, application of the program to Citronelle's situation could not have caused hardship or inequity. The district court concluded, and we agree, that substantial evidence supported the agency's finding that Citronelle was prevented from participating in the tertiary program, and would not have undertaken the tertiary project without exception relief. 601 F.Supp. at 1416–19. The crux of this finding is that Citronelle simply did not have, and could not obtain, the capital necessary to start a project.

The evidence showed that financing a tertiary project from within Citronelle's ownership itself was not feasible. Citronelle established that its revenues had been declining steadily in recent years, and that the tertiary project offered only a risky prospect of future revenues. *See* 601 F.Supp. at 1417. Plaintiff's expert testified otherwise, but OHA concluded that the expert overstated projected revenues and either underestimated or ignored the problem of capital expenditures. *See id.* (citing DOE at 82,660–63).

Likewise, the evidence showed that financing from external sources apparently was not available in sufficient amounts to provide the front-end capital necessary to induce the working interest owners to vote for the project. OHA considered three possibilities—a drilling fund, conventional bank financing, and financing by the major working interest owners—but concluded that none of the alternatives was feasible, and the district court found substantial evidence supporting this conclusion. *See* 601 F.Supp. at 1418–19. In conclusion, the district court stated: "While plaintiffs have presented evidence that might lead a court to decide issues differently, were it writing

on a clean slate, they have not demonstrated that any of OHA's findings lacked substantial support." *Id.* at 1419. Applying the same substantial evidence standard, we reach a similar conclusion. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) (reviewing court should not disturb agency's finding even if, on a de novo hearing, it might have reached a contrary conclusion); *Powerine,* 536 F.2d 378 (this Court should defer to an agency's expertise in applying the substantial evidence test to agency action involved in administering complex petroleum regulations); *Breeden v. Weinberger,* 493 F.2d 1002, 1010 (4th Cir.1974) (agency's action should receive greater deference on review when the action was based on testimony presented under oath and subject to cross-examination).

### 4. *Nature of Exception Relief*

Finally, plaintiffs argue that the very nature of the exception relief makes it invalid. Because the argument does nothing more than challenge the exception relief as excessive, we will address the argument in the part of our opinion reviewing the district court's holding on the excessiveness issue. *See infra* Part C. 2 & n. 7 and accompanying text.

### C. *Appeal by DOE (as well as Other Federal Defendants) and by Citronelle in Temp.Emer.Ct.App. Nos. 3–39, 3–40, 3–41 & 3–42*

After rejecting plaintiff's arguments that DOE lacked authority to grant Citronelle exception relief, the district court granted in part plaintiff's motion for summary judgment because, as the court put it, "the agency's decision must be set aside because the amount of relief awarded was excessive and outside the agency's authority." 601 F.Supp. at 1419. The district court directed that the case be remanded to OHA and that OHA reduce the amount of exception relief awarded to Citronelle. *Id.* at 1420–21. On remand, according to the district court's instructions, OHA had to calculate the amount of marginal property

revenues available to Citronelle in December 1980, after windfall profit taxes. *Id.* OHA then was to deduct that amount from the $63.8 million relief "in order to determine how much exception relief was needed to give Citronelle a total of $60 million in front-end capital." *Id.* Finally, the district court instructed OHA to calculate on remand "what amount of bank financing was available to Citronelle, if any, and deduct that amount from the grant of exception relief." *Id.* at 1421.

Citronelle and DOE appeal from the part of the district court Opinion and Order that held the amount of exception relief granted Citronelle was excessive and beyond the agency's authority.

### 1. *Appealability of Order*

■ This Court has jurisdiction over orders that are either appealable as final decisions under 28 U.S.C. § 1291 or appealable pursuant to section 211(d) or section 211(e) of the ESA. *See Marine Petroleum*

*Co. v. Champlin Petroleum Co.*, 657 F.2d 1231, 1238 (Temp.Emer.Ct.App.1980) (holding that this Court has the powers of a circuit court under 28 U.S.C. § 1291, except as otherwise provided in section 211 of the ESA). We hold that the district court's order is appealable within the terms of section 211.

Section 211(e) of the ESA [3] supports the appealability of the district court's order. After establishing the limited opportunities for district court injunctions under the ESA, section 211(e)(1)(B) grants district courts the power to declare that an agency regulation or order issued under the ESA is beyond agency authority or not supported by substantial evidence. Section 211(e)(2) provides that "[a]ny party" that is "aggrieved" by such a declaration may appeal to this Court by filing a timely notice of appeal. Although section 211 allows appeals of declarations that would probably be considered interlocutory outside of the special context of the ESA,[4] therefore, the

**3.** The full text of this provision follows:

(e)(1) Except as provided in subsection (d) of this section, no interlocutory or permanent injunction restraining the enforcement, operation, or execution of this title, or any regulation or order issued thereunder, shall be granted by any district court of the United States or judge thereof. Any such court shall have jurisdiction to declare (A) that a regulation of an agency exercising authority under this title is in excess of the agency's authority, is arbitrary or capricious, or is otherwise unlawful under the criteria set forth in section 706(2) of title 5, United States Code, or (B) that an order of such agency is invalid upon a determination that the order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

(2) Any party aggrieved by a declaration of a district court of the United States respecting the validity of any regulation or order issued under this title may, within thirty days after the entry of such declaration, file a notice of appeal therefrom in the Temporary Emergency Court of Appeals. In addition, any party believing himself entitled by reason of such declaration to permanent injunction restraining the enforcement, operation, or execution of such regulation or order may file, within the same thirty-day period, a motion in the Temporary Emergency Court of Appeals requesting such injunctive relief. Following consideration of such appeal or motion, the

Temporary Emergency Court of Appeals shall enter a final judgment affirming, reversing, or modifying the determination of the district court and granting such permanent injunctive relief, if any, as it deems appropriate.

15 U.S.C. § 754 (incorporating 12 U.S.C. § 1904 note).

**4.** Legislative history of the 1971 Amendments to the ESA shows Congress' recognition of the likelihood that the government, as in this case, will appeal district court decisions declaring an agency order beyond the agency's authority:

Any party aggrieved by such a declaration may appeal to the Temporary Emergency Court of Appeals. It is assumed that the usual practice of the Government would be to appeal from a declaration of the district court of the invalidity of an agency regulation or order. But this, of course, is within the province of the Attorney General in conducting the litigation of the Government. A possible result of this situation, however, is that a party challenging the regulation could secure a district court declaration that the regulation was, as a matter of law invalid. If the Government decided not to appeal this declaration, the prevailing party might be unable to secure the appropriate relief. In such case, provision is made that such a party believing himself entitled by the district court injunction to a permanent injunction restraining the enforcement of the regulation, could file within 30 days in the Temporary Emergency Court

provision has its own safeguards. *See, e.g., Navajo Refining Company v. DOE,* 750 F.2d 966 (Temp.Emer.Ct.App.1984) (district court decision did not "respect the validity of any regulation or order" issued under the ESA and, therefore, section 211(e)(2) inapplicable); *Quincy Oil, Inc. v. FEA,* 620 F.2d 890 (Temp.Emer.Ct.App. 1980) (DOE not "aggrieved" by district court order; thus DOE could not appeal under section 211(e)(2)); *see also Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corporation,* 591 F.2d 711 (Temp.Emer.Ct. App.) (appeal dismissed because of failure to file timely notice of appeal required by section 211(e)(2) and by Rule 15 of the Temporary Emergency Court of Appeals), *cert. denied,* 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979).

The appeals by DOE and Citronelle satisfy the requirements of section 211(e). The district court decision concerns the validity of an order issued under the ESA. Moreover, both Citronelle and DOE have been "aggrieved" by the declared invalidity of DOE's exception order. In *Quincy Oil,* DOE was not "aggrieved" because the dis-

trict court decision granting summary judgment took a position that had been adopted by DOE in one of its own rulings during the litigation and, consequently, DOE could not benefit from the appeal. By contrast, both Citronelle and DOE have been aggrieved by the district court decision declaring the exception relief to Citronelle beyond DOE's authority. Citronelle obviously will receive a reduced exception award under the decision and DOE, according to the instructions in the decision, must now adopt a position that it has implicitly rejected in its Final Decision. Both parties, therefore, can benefit from the appeal.[5]

### 2. *Merits of Appeal*

■ We now turn to the question whether the district court correctly decided that the amount of exception relief granted by DOE was excessive. DOE structured the relief to offset the inequity to Citronelle. Because the determination of what relief is required to redress an inequity is properly within the scope of agency expertise and should be given great deference by the

---

of Appeals a motion for appropriate relief. Following consideration of such a motion, the Court could enter a final judgment giving appropriate relief.

Senate Comm. on Banking, Housing and Urban Affairs, Economic Stabilization Act Amendments of 1971, S.Rep. No. 507, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Ad. News 2283, 2294.

5. Even if section 211(e) did not support Citronelle and DOE's appeal, the district court decision could be considered an appealable remand order. Remand orders present special problems of appealability. Treated literally, these orders would never be considered final because they by definition require further action. Finality within the meaning of section 1291, however, has not been construed so narrowly. "Section 1291 is to be given 'a practical rather than a technical construction.'" *MGPC, Inc. v. DOE,* 673 F.2d 1277, 1282 (Temp.Emer.Ct.App.1982) (quoting *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 375, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981)). Accordingly, courts have recognized that remand orders should be considered appealable when doing so would satisfy the purposes underlying section 1291 finality. *See e.g., Regents of University of California v. Heckler,* 771 F.2d 1182 (9th Cir.1985); *Stone v. Heckler,* 722 F.2d 464 (9th Cir.1983).

Both *Regents of University of California* and *Stone* involved district court orders remanding cases to the Secretary of Health and Human Services. The remand orders instructed the Secretary to apply legal standards that had not been applied previously. The United States Court of Appeals for the Ninth Circuit held the orders to be appealable, primarily in order to avoid the wasted resources that could result from the application of an erroneous standard. *See Regents of University of California,* 771 F.2d at 1186–87; *Stone,* 722 F.2d at 467.

As in *Regents of University of California* and *Stone,* we believe that the district court order remanding to OHA for a reduced exception award is best considered appealable. Applying a new legal standard, the district court order mandates a particular result: a reduced exception award to be achieved by deduction of available marginal property funds and alternative financing. The district court mandated this result because it believed DOE's exception relief excessive. If this belief proves wrong, the proceedings on remand will be wasted. Consequently, we believe that in the circumstances of this case the district court's decision holding the amount of exception relief excessive should be considered appealable.

courts, we conclude that the district court's decision that the amount of relief awarded was excessive and therefore outside the agency's authority must be reversed.

The agency offered Citronelle two alternative forms of relief which it considered to be roughly equivalent. The first alternative gave Citronelle $22.5 million, which was an amount equivalent to that which it could have earned if it had been able to participate in the tertiary program from its effective date. It contemplated Citronelle providing the remainder of the needed capital from other sources. The alternative developed in the interim decisions and memoralized in the Final Decision gave Citronelle over $60 million in relief, the total projected amount of the necessary capital for the project. The relief contained restrictions. The most important of these restrictions was waiver of access to any tertiary incentive revenues under the program and the repayment of the relief, with interest, if the project was ultimately deemed successful by DOE.[6]

OHA, considering the variables of each program, decided that the alternatives were roughly equal. 10 DOE at 82,640–41. The district court apparently disagreed, although it never addressed the issue squarely. It reversed OHA's final decision because the agency had not deducted from the projected capital needed for the project the marginal property revenues that Citronelle had received and had not considered the availability of bank financing, 601 F.Supp. at 1419–21. We agree with the district court that the amount of exception relief awarded must be only what is required to alleviate the particular inequity. *Id.* at 1419. In its decision, however, the court did not consider the potentially offsetting effect of the restrictions in the alternative relief granted to Citronelle. If those restrictions are taken into account, we cannot say that the agency's award of exception relief, based upon its presumed

expertise, was excessive. DOE properly could determine that the alternative relief was roughly equivalent to the lower amount with no repayment obligation and was no more than required to redress the inequity.

Nevertheless, plaintiffs have attempted to characterize the nature of the exception relief as excessive. Many of the elements in this characterization represent separate arguments made before OHA and before the district court. Because plaintiffs have revived these arguments in their briefs and at oral arguments, we will discuss them briefly.

Plaintiffs have argued, for instance, that OHA impermissibly granted Citronelle retroactive exception relief. Admittedly, Citronelle was allowed to recertify crude oil produced during earlier time periods. That fact does not, however, necessarily make the relief retroactive. As OHA observed, the relief was designed to induce Citronelle to begin a program that it could not otherwise have begun. 10 DOE at 82,657–58. OHA therefore concluded, and we agree, that the nature of the relief was prospective. We also agree with OHA that, even if the relief were retroactive, Citronelle's situation would satisfy the standard for granting retroactive relief. *See id.* n. 23 (citing, among other authorities, *Kerr-McGee Corp.*, 2 FEA ¶ 80,533, at 80,612 (1975), which indicates on page 80,616 that the general policy objectives militating against retroactive relief—i.e., avoiding ratification of noncompliance, and perhaps violations, that would occur without a rigid standard for retroactive relief—should not frustrate relief if the particular situation does not threaten the objectives).

Whereas the rest of plaintiff's arguments attacking the nature of the relief do no more than highlight the ways in which the exception relief departs from the program's norm,[7] one argument is more broad-

---

**6.** DOE has taken steps to ensure that the success of Citronelle's project will be determined in an objective and methodologically sound· manner. *See* 10 DOE at 82,666–67.

**7.** Plaintiffs also have attacked the exception relief as beyond DOE's authority because of the Executive order that decontrolled crude oil and refined petroleum projects. *See* Executive Order No. 12287, 46 Fed.Reg. 9909 (January 30,

ly based. Plaintiffs have argued below, and implicitly in their brief to this Court, that the exception relief granted to Citronelle amounts to an illegitimate government subsidy funded by the members of the entitlements program. In another context, this Court has squarely rejected such an argument. *See Atlantic Richfield Company v. DOE*, 655 F.2d 227 (Temp. Emer.Ct.App.1981) (to the extent that regulations forced a subsidy for petroleum substitutes, the subsidization would have to be borne by members of entitlements program). The entitlements program brings its members benefits as well as burdens. To the extent that the exception relief to Citronelle has burdened members of the entitlements program, we consider the burdens to be legitimate ones that the members should bear. *Cf. Ashland Oil, Inc.*, 8 DOE ¶ 80,193 at 80,932 (1981) (refiners must share benefits and burdens of price controls with producers in order to "further *national* energy policy goals, not merely the parochial interests of one group or another") (emphasis in original).

Large and unprecedented awards previously have been permitted. *See, e.g., Bonnaffons v. DOE*, 646 F.2d 548 (Temp.Emer. Ct.App.1981), *aff'g*, 492 F.Supp. 1276 (D.D. C.1980); *cf. Asamera Oil (U.S.), Inc.*, 10 DOE ¶ 81,031, at 82,699 (1983) (one refiner has received more than $150 million in exception relief over a six-month period). Again, *Bonnaffons* is instructive. That is the case in which Judge Gesell affirmed an OHA decision ordering Shell, pursuant to a grant of exception relief, to apply gasoline to a Puerto Rican distributor and to buy gasoline from Puerto Rican refiners. As Judge Gesell concluded, "The fact that the precise form of relief granted was unusual and perhaps unprecedented does not carry it beyond the scope of agency authority." 492 F.Supp. 1282 (footnote omitted). This Court, on appeal, upheld the district court's

broad definition of the agency's power to award exception relief, including the power to act without express authority, even though the agency authority in this case was "problematic." 646 F.2d at 552. Therefore, DOE's grant of exception relief is not beyond its authority, given its broad power to grant and to structure exception relief.

## V. *Conclusion*

The part of the district court's opinion upholding the agency's grant of exception relief must be affirmed. Plaintiff's arguments are unpersuasive. Rulemakers need not have expressed an intention to allow exception relief to a particular regulation, and Citronelle's participation in the rulemaking proceedings that led to the tertiary incentive program has no effect on its ability to claim exception relief. The argument that DOE created an entirely new program, custom-made for Citronelle, cannot overcome the agency's broad authority to grant exception relief.

Conversely, we must reverse the part of the district court's opinion holding the amount of exception relief to be excessive and remanding, with instructions, to the agency. Although the grant of over $60 million, with restrictions may have been generous, DOE's broad discretion in structuring exception relief justifies the alternative relief offered to and taken by Citronelle in this case.

Accordingly, that part of the district court's Opinion and Order which upheld the authority of DOE to grant exception relief to Citronelle is affirmed; that part of its Opinion and Order which held the amount of exception relief to be excessive is reversed.

---

1981) (directing DOE to promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order). We agree with OHA that this order did not affect its authority to grant relief on pending petitions. *See* 10 DOE at 82,654–55. The

savings provision in the EPAA provides, moreover, that the expiration of the Act will not affect pending proceedings. *See id.* at 82,654 (quoting EPAA § 18, 15 U.S.C. § 760g, as amended by section 461 of the [ECPA], Pub.L. No. 94–163, 89 Stat. 955 (1975)).